**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MY STORE, INC., Respondent.**

**No. 71–1491.**

United States Court of Appeals, Seventh Circuit.

Argued May 25, 1972.

Decided Sept. 14, 1972.

Certiorari Denied Jan. 22, 1973.
See 93 S.Ct. 965.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Abigail Cooley Baskir, Atty., N. L. R. B., Washington, D. C., for petitioner.

Russell Packard, Chicago, Ill., for intervenor.

Matthew E. Murray, Charles J. Griffin, Jr., Chicago, Ill., Charles E. Bliss, Taylorville, Ill., for respondent.

Before Mr. Justice CLARK,[1] SWYGERT, Chief Judge, and STEVENS, Circuit Judge.

SWYGERT, Chief Judge.

The National Labor Relations Board petitions for the enforcement of its supplemental order issued against respondent My Store, Inc. on February 7, 1970.[2] The order requires that respondent pay twenty of its employees specified amounts with interest as backpay flowing from unfair labor practices which had been engaged in by the respondent.

A brief history of the case will be undertaken. Pasquo Podeschi is president and the operating head of My Store, Inc., a supermarket in Taylorville, Illinois. Organization of the company's employees by the United Retail Workers Union (Independent) began in December 1962. Following the filing of an NLRB petition, an election was held in February 1963; the union won. Shortly thereafter, the parties began negotiating for a contract, but only after the union had filed and then dismissed various unfair labor charges against the employer. On May 2, 1963 the union struck respondent and on May 8 filed the charges on which these proceedings are based. On December 9, 1963 a trial examiner found that My Store had violated sections 8(a)(1), (3) and (5) of the National Labor Relations Act. The Board af-

---

1. The Honorable Tom C. Clark, Associate Justice of the United States Supreme Court (Retired), is sitting by designation.

2. The Board's supplemental decision and order are reported at 181 N.L.R.B. 47 (1970).

firmed the trial examiner on May 25, 1964. The Board found *inter alia* that the company had discriminatorily cut the hours of employment of certain union adherents, that the strike had been motivated by the company's unfair labor practices, and that the company had unlawfully rejected the union's unconditional request of July 11, 1963 that the strikers be reinstated. As part of the remedy the Board ordered the company to offer those strikers who had made unconditional requests to return, full and immediate reinstatement to their former or substantially equivalent positions, and to compensate them for any loss of pay as a result of the company's unfair labor practices. On April 7, 1965 this court enforced the Board's order in full. NLRB v. My Store, Inc., 345 F.2d 494 (7th Cir.), cert. denied, 382 U.S. 927, 86 S.Ct. 315, 15 L.Ed.2d 340 (1965).

On October 17, 1966 the Board filed a petition with this court asking that the company and its president be adjudged in civil contempt for willfully failing to offer the strikers reinstatement as required by the court's decree. The company defended on the ground that it had made offers of reinstatement to the twenty strikers in September and October 1963; the Board responded that the offers were invalid.[3] On April 22, 1968 this court adjudged the company and its president in civil contempt as to twelve strikers, on the grounds that the offers of reinstatement "were not valid and were made willfully and with knowledge that they were not in compliance with the decree of this court."

The company thereafter made offers of reinstatement to the twelve strikers, and this court on June 14, 1968, having determined that the purgative terms of its contempt order had been satisfied by the company's offers, remanded the case to the Board to determine "what specific

sums in backpay are due what employees" of the company.

Pursuant to a backpay specification and appropriate notice, a hearing was held to determine (1) whether the strikers not included in the contempt litigation had forfeited their rights to reinstatement, (2) the specific amounts of backpay due to all the strikers, and (3) the amounts of backpay due to two nonstrikers who had suffered discriminatory wage reductions. The specification alleged that the backpay period for most of the twenty strikers ran from various periods in 1963 until June 30, 1968, by which time the company had made reinstatement offers to twelve of the strikers. As to the other eight strikers not included in the contempt adjudication, the specification alleged that their backpay period would continue to run until the company made adequate offers of reinstatement to them. At the conclusion of the hearing the examiner recommended backpay awards to twenty of the discriminatees, the respective awards being based on the difference between each discriminatee's loss of pay due to the company's unfair labor practices and his interim earnings from other employment.

The Board on the basis of the proceedings before the examiner determined that as of June 30, 1968, the discriminatees were entitled to various sums with interest. The total award was approximately $97,000. The Board further determined that seven of the eight discriminatees who were not included in the contempt proceedings had not forfeited their rights to reinstatement by their responses to the company's invalid reinstatement offers, and that since as of June 30, 1968, they had not received valid offers of reinstatement, their backpay period would continue to run until they either removed themselves from the labor market or received valid offers of reinstatement.

---

3. As to eight of the twenty strikers, however, the Board requested that it be permitted to investigate further, in order to determine whether these strikers had, by their responses to the offers, forfeited their rights to reinstatement.

## I

In reviewing the Board's supplemental order, we are constrained to follow the Supreme Court's recent pronouncement pertaining to the Board's authority over the backpay remedy:

We start with the broad command of Section 10(c) of the National Labor Relations Act, 29 U.S.C. Section 160(c), that upon finding that an unfair labor practice has been committed the Board shall order the violator "to take such affirmative action, including reinstatement with or without backpay, as will effectuate the policies" of the Act. This Court has stated that the remedial power of the Board is "a broad discretionary one, subject to limited judicial review." Fibreboard [Paper Products] Corp. v. N. L. R. B., 379 U.S. 203, 216 [,85 S. Ct. 398, 13 L.Ed.2d 233] (1964). . . . As with the Board's other remedies, the power to order backpay "is for the Board to wield, not for the courts." N. L. R. B. v. Seven-up Bottling Co., 344 U.S. 344, 346 [,73 S.Ct. 287, 97 L.Ed. 377] (1953). "When the Board 'in the exercise of its informed discretion,' makes an order of restoration by way of backpay, the order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *Id.* at 346–347 [,73 S.Ct. 287].

One of the defenses interposed by the respondent relates to the union's payment to the strikers during the strike of amounts equal to the wages they would have received from the company had they been working. According to the trial examiner's findings, the union's National Executive Director met with the employees a few days prior to the strike and informed them that if they decided to strike in response to the company's unfair labor practices, the union would advance them loans equivalent to their net wages to be repaid when the company was found to be in violation of the Act and order to make restitution. The employees decided to strike under those conditions, agreed to the loan proposal, and later signed formal loan agreements.

During the strike the strikers received weekly checks from the union equal in amount to their net take-home pay. This practice was continued even when the strikers were unable to picket because of illness or job searches. The strikers, however, received none of the usual benefits afforded union employees such as hospitalization and fringe benefits. The examiner concluded: "The Union considered the discriminatees essentially as locked-out strikers who were receiving strike benefits which would eventually be repaid to the Union, and not as its employees."

Because of an administrative inadvertence, the union initially treated these payments as income for tax purposes, and accordingly made social security and tax payments on behalf of the strikers. At the end of 1963, when the error was discovered, the union filed amended tax forms and received credit for the sums erroneously reported.

Besides receiving their net take-home pay from the union, two strikers, Frank Sartore, Jr. and Harold Banfield, each received $15.00 per week for additional work on the picket line. These amounts were treated as income by the union for tax purposes and were deducted as interim earnings from the backpay awarded these two strikers.

The company argues that because of the money received by the union, the strikers sustained no loss in wages during the period for which the backpay awards were granted. The argument must be rejected. Under the arrangement with the union, the sums received by the strikers, except for the additional amounts paid Sartore and Banfield for picket line duties, were not earned income. The strikers were required to repay the amounts received as "loans" when the company honored its backpay obligations to them. Moreover, even if there had been no obligation to

reimburse the union, the payments would still qualify as collateral strike benefits and exempt as interim earnings unless received as a condition precedent to, or in compensation for, picketing or other services. Golay & Co. v. NLRB, 447 F.2d 290 (7th Cir. 1971). Cf. NLRB v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951).

## II

■ The company insists that no backpay may be awarded beyond the date of the staggered offers of reinstatement made during the September-October 1963 period, despite the fact that the invalidity of these offers is no longer in dispute. It argues that under the recent decisions of the Board in Southwestern Pipe, Inc., 179 N.L.R.B. 364 (1969), O'Daniel Oldsmobile, Inc., 179 N.L.R.B. 398 (1969), and National Business Forms, 189 N.L.R.B. 136 (1972), the backpay of the strikers should have been tolled as to those strikers who refused the September-October 1963 offers because they wanted to return as a group.

In O'Daniel Oldsmobile, Inc. the Board applied Southwestern Pipe, interpreting the case as holding that where an employer makes staggered offers of reinstatement in good faith and the strikers refuse them because they wish to return as a group, the offers toll backpay as to those strikers who refuse the offers even though the strikers' right to reinstatement is unaffected. O'Daniel Oldsmobile, Inc., 179 N.L.R.B. at 398 n. 4.

In its decision in the instant proceeding, the Board discussed Southwestern Pipe and the two related cases and found them to be inapposite. The Board said:

> Since the Court herein specifically found that Respondent's *motive* in offering reinstatement on a staggered basis, as indicated by its "animosity" to the Union, militated against a finding that such offers were valid, it seems clear that backpay cannot be tolled, even though several discriminatees insisted on returning as a group. Not only does the rule set forth in *Southwestern Pipe* and *O'Daniel Oldsmobile* require the absence of a discriminatory motive, but it is clearly inapplicable to a situation where, as here, a Court has found that Respondent made such staggered offers of reinstatement "willfully and contumaciously with knowledge that they were not in compliance" with the Board's court-approved order.

The company counters that both *Southwestern Pipe* and *O'Daniel Oldsmobile, Inc.* involved employers whose conduct was not only found to be violative of the Act but also reflective of a discriminatory motive and a general anti-union animus. Thus, they maintain, there is no difference between those cases and the instant one. The General Counsel's response to this argument is persuasive. As he points out, while the unfair labor practices found in those cases did mirror an anti-union animus and a discriminatory motive, this did not mean that the specific act, giving staggered offers of reinstatement, also was done in bad faith. In *Southwestern Pipe* the employer's refusal to reinstate some of the strikers was based on a good faith but erroneous opinion that they were economic rather than unfair labor practice strikers. In *O'Daniel Oldsmobile, Inc.* the employer's offer of reinstatement was based on a general agreement with the union to replace the strikers as vacancies occurred.

Here, there is no question about the company's bad faith in making the staggered offers which required a response within one day, and at most three days, after the offers were mailed. In the contempt proceedings, we had concluded that the company's offers were made "willfully and contumaciously with knowledge that they were not in compliance" with our original order. That finding completely distinguishes this case from *Southwestern Pipe* and *O'Daniel Oldsmobile, Inc.*

### III

■■ The company resists enforcement of the supplementary order on the further ground that the strikers willfully incurred a loss of earnings by not making a diligent job search during the backpay periods in question. It argues that the strikers' obligation to mitigate damages by seeking other employment was "undermined" by the union's payment of "full wages" during the strike. In particular, it canvasses the evidence relating to three individual strikers, suggesting that these are typical of the entire group. Based upon its analysis of these cases, it contends that the Board's rulings are erroneous. We do not agree. In the first place, it is settled that the courts will not undertake a de novo review of the Board's backpay computations. Winn-Dixie Stores, Inc. v. NLRB, 413 F.2d 1008 (5th Cir. 1969). Secondly, the trial examiner's findings indicate a careful, painstaking evaluation of the evidence relating to each of the discriminatees. Finally, our examination of the record as a whole convinces us that the examiner's findings, adopted by the Board, are supported by substantial evidence. In these circumstances, it would serve no useful purpose to prolong this opinion by dissecting the bits and pieces of the evidence as to each of the twenty discriminatees.

The company strongly argues that since the strikers received the equivalent of their wages from the union during the strike there was little incentive on the part of these people to seek outside employment. But this is only a permissible inference from the facts. It does not by itself prove that the strikers failed to make a diligent job search. The trial examiner, after reviewing all the evidence, acknowledged that this could have been a factor but concluded: "The fact that some of them may not have searched as diligently for work before the Union ceased making the loans as they did afterwards is an indication of the impelling necessity to obtain employment and does not mean that they were not searching for reasonably equivalent employment prior to that time." We think this conclusion was warranted.[4]

Subsequent to oral argument, the company has called our attention to NLRB v. Madison Courier, Inc., No. 24,808, decided by the District of Columbia Circuit on August 9, 1972. We are in general agreement with the views expressed in that case, both in the majority and the concurring opinions, but do not believe its holding requires any modification of our conclusions. In that case, the court looked with disfavor on the Board's considering the backpay claimants as a single group rather than "examining their respective efforts to locate interim employment on an individualized basis." The court concluded: "Such a disposition clearly violated the recognized principle of treating each particular claimant separately in determining his right to backpay." This is not the situation here. The trial

---

4. In NLRB v. Madison Courier, Inc., No. 24,808, (D.C.Cir., filed Aug. 9, 1972), the court observed:

> The application of rigid rules regarding the effect of picketing or receiving union strike benefits during the back pay period on the determination of mitigation doctrine questions has similarly been eschewed. The fact that unfair labor practice strikers received strike benefits does not diminish their right to receive back pay, providing they otherwise made reasonable efforts to locate suitable interim employment. Likewise, the fact that such persons engaged in picketing during the back pay period does not automatically negate their right to reimbursement by their employer. However, like the receipt of strike benefits, picket line activity does not relieve the discriminatees of the obligation of making reasonable efforts to obtain appropriate interim employment.

We are in agreement with this statement of the law. Moreover, we are satisfied that these are the criteria which were in fact applied by the examiner in the instant proceeding.

examiner examined and evaluated the facts peculiar to each claimant. He was discriminating in his disallowance of backpay when the facts warranted that during certain periods the strikers had not made an adequate job search. For example, he disallowed backpay for claimant Harold Banfield for a particular period after the start of the strike because the claimant was more interested in maintaining the picket line than in finding an outside job.[5] Similarly, the examiner after an extensive review of the evidence pertaining to claimant Frank Sartore found that Sartore had taken himself out of the job market for a period of a year and three months after the start of the strike and thus was not entitled to backpay during that time.[6]

## IV

 The company's final contention is that since the employees had the benefit of the union loans, no interest

should be allowed on their backpay. There is no question that the Board has the authority to allow interest. Revere Copper & Brass, Inc. v. NLRB, 324 F.2d 132 (7th Cir. 1963). The fact that strikers received some payment from the union during part of the backpay periods should not in itself disqualify them from receiving any interest on the awards. However, interest should not have been allowed on that part of the awards which represents lost wages for the periods when the union advanced loans that were equivalent to the claimants' take-home pay. The loan agreements specifically provided that the loans should bear no interest. Thus, it would be inequitable to require the respondent to pay interest on the sums represented by loans since the claimants themselves suffered no loss of the use of those monies.

The Board's supplemental order as modified will be enforced.

---

5. On this point the examiner said :

Banfield's forms and his testimony indicate to me that from the inception of the strike and particularly after he and F. Sartore starting sharing responsibility for the picketing, through the third quarter of 1964, he was not interested in leaving the picket line for employment elsewhere, but in effect withdrew from the labor market and involved himself solely with the strike. When the Union in the fall of 1964 made it clear to the discriminatees that they had to actively seek employment to be considered in the labor market, Banfield and some others for the first time started to really search for other work. I have concluded from the testimony here and find that Banfield was not in the labor market through the third quarter of 1964, and accordingly determine that his backpay claims for the period from July 11, 1963, through

September 30, 1964, should not be allowed.

6. The examiner stated in part:

On the basis of these exhibits and his testimony, I have concluded that from the third quarter of 1963 through the third quarter of 1964 Frank Sartore withheld himself from the labor market and continued to engage in and to some extent direct picket line activities. While thus engaged Sartore was receiving his strike benefit loan and the added $15 per week which meant that he had better than $100 per week to support his wife and family of five children.

Since I find that Sartore did not seek employment during that five-quarter period, I further find that he is not entitled to backpay for that period and so strike those five quarters from the backpay specification.