TUBARI LTD., INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TUBARI LTD., INC., Respondent.

Nos. 91–3434, 91–3490.

United States Court of Appeals, Third Circuit.

Argued Feb. 10, 1992.

Decided March 19, 1992.

Stephen J. Edelstein (argued), Schwartz, Pisano, Simon & Edelstein, Livingston, N.J., for Tubari, Inc.

Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Charles Donnelly, Supervisory Atty., David Seid, Atty. (argued), N.L.R.B., Washington, D.C., for the N.L.R.B.

Before: GREENBERG and COWEN, Circuit Judges, and GREEN, District Judge.[*]

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This case, before us on a petition for review and application for enforcement of a decision and order of the National Labor Relations Board, requires us to determine whether unlawfully-discharged, unskilled employees satisfied their duty to mitigate damages by accepting from their union 66% of their former salary as "wages" for picketing without otherwise searching for interim employment. We will grant the petition for review and will set aside the decision and order which found that the discriminatees had reasonably mitigated their damages.

### I.

### BACKGROUND

The case is not complicated and the historical facts are not in dispute. Inasmuch as the employer, Tubari Ltd., Inc., violated sections 8(a)(1), (2) and (3) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1), (2) & (3), by unlawfully discharging and/or refusing to reinstate 19 of its employees, the Board ordered the employees' reinstatement and further ordered Tubari to pay them lost earnings and benefits, 287 N.L.R.B. 1273 (1988). We entered a judgment enforcing its order. *NLRB v. Tubari Ltd.,* 869 F.2d 590 (3d Cir.1989) (table). Because the parties disputed the amount of backpay due the discriminatees, a hearing was held on the issue before an administrative law judge. The Board issued a compliance specification deducting from the backpay monies received by the discriminatees for picketing activities. Tubari then filed an answer asserting that the

---

[*] Honorable Clifford Scott Green, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

discriminatees were not entitled to any backpay since they failed to conduct a diligent search for suitable interim employment.

At the hearing, a Board compliance officer testified that the discriminatees each received $150.00 per week from the Fur Workers Union Local 3, United Food and Commercial Workers, AFL–CIO, together with $25 per week lunch money. As a condition for receiving the money, the union required the discriminatees to picket from 7:30 a.m. to 3:00 p.m. every day, a circumstance that led the compliance officer to deem the $150 as "interim earnings" rather than strike benefits. While the Board's General Counsel stipulated that none of the discriminatees searched for other interim employment, the administrative law judge nevertheless determined that they had reasonably mitigated damages and were thus entitled to backpay.

On June 26, 1991, the Board issued a supplemental decision and order agreeing with the administrative law judge. *Tubari Ltd., Inc.*, 303 N.L.R.B. No. 86 (1991). The Board found that the picketing "was true employment in the sense that the discriminatee/picketers worked regular hours and were paid a specific weekly wage plus lunch expenses. These were not mere strike benefits." *Id.* at 6. In finding that the discriminatees had properly mitigated their losses, the Board deemed it significant that they were unskilled laborers and opined that picketing would not excuse skilled workers from seeking employment in another trade. *Id.* at 4–5.

Tubari has filed a petition to review the Board's order pursuant to 29 U.S.C. § 160(f) and the Board has filed a cross-petition for enforcement of its order pursuant to section 160(e).

## II.

## DISCUSSION

### A.

■ The Board may "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]" to remedy an employer's unfair labor practices. 29 U.S.C. § 160(c). Because of its expertise in resolving labor disputes, *see NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 346–47, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953), the Board enjoys wide discretion in fashioning remedial orders. *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964); *Kenrich Petrochemicals, Inc. v. NLRB*, 907 F.2d 400, 405 (3d Cir.) (in banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 509, 112 L.Ed.2d 522 (1990). In particular, a reviewing court will not disturb a backpay order " 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " *Fibreboard*, 379 U.S. at 216, 85 S.Ct. at 406 (quoting *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).

■ While the Board is entitled to deference, we exercise plenary review over questions of law. *NLRB v. Louton, Inc.*, 822 F.2d 412, 414 (3d Cir.1987). The Board's findings of fact will be overturned if there is no substantial evidence in the record, considered as a whole, to support them. *Id.; see also* 29 U.S.C. § 160(e) ("findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive"). While we do not substitute our judgment for that of the Board, we may modify an order to ensure that it effectuates the policies of the Act. *NLRB v. Future Ambulette, Inc.*, 903 F.2d 140, 144 (2d Cir.1990).

■ After the amount of backpay has been established, the burden shifts to the employer to produce evidence that would mitigate its liability. *Lundy Packing Co. v. NLRB*, 856 F.2d 627, 629 (4th Cir.1989); *Iron Workers Local 118, etc. v. NLRB*, 804 F.2d 1100, 1102 (9th Cir.1986); *NLRB v. Pilot Freight Carriers, Inc.*, 604 F.2d 375, 377 (5th Cir.1979). An employer may meet this burden (and thus be entitled to a de-

duction from gross backpay) by, *inter alia,* establishing that the employee has willfully incurred losses through unjustifiably refusing adequate interim employment. *Phelps Dodge,* 313 U.S. at 198–200, 61 S.Ct. at 854–55. Further, an employer need not establish that the employee would have secured such employment, for the employer meets its burden on the mitigation issue by showing that the employee has withdrawn from the employment market. Accordingly, where the employer demonstrates that an employee did not exercise reasonable diligence in his or her efforts to secure employment, then it has established that the employee has not properly mitigated his or her damages. *Iron Workers,* 804 F.2d at 1102; *Pilot Freight Carriers,* 604 F.2d at 377.

■ The type of work the employee must seek depends upon his or her abilities. Generally, the employee must seek interim employment "substantially equivalent" to the position of which he or she was unlawfully deprived and that employment must be suitable to a person of like background and experience to the employee. *NLRB v. Madison Courier Inc.,* 472 F.2d 1307, 1318 (D.C.Cir.1972) (*Madison Courier I*) (citing *NLRB v. Miami Coca–Cola Bottling Co.,* 360 F.2d 569, 575 (5th Cir.1966)); *accord Standard Materials, Inc. v. NLRB,* 862 F.2d 1188, 1192–93 (5th Cir.1989).[1] While the reasonableness of an employee's efforts in seeking interim employment is normally determined by such factors as the economic climate and the employee's skills, qualifications and age, *Lundy Packing,* 856 F.2d at 629, if the employee has exercised no diligence whatsoever "the circumstance of a scarcity of work and the possibility that none would have been found even with the use of diligence is irrelevant." *Madison Courier I,* 472 F.2d at 1319 (quoting *American Bottling Co.,* 116 N.L.R.B. 1303, 1307 (1956)).

### B.

Tubari's argument is straightforward. It argues that the discriminatees' acceptance of $150 per week, roughly 66% of their weekly wage at Tubari, did not excuse them from their duty to search for interim employment. Therefore, since the discriminatees did not even attempt to seek other work, they failed to mitigate damages and are not entitled to backpay. The Board responds that there is a recognized distinction between the receipt of strike benefits, which are not deductible from backpay, and payment in return for picketing. In the Board's view, the latter can in certain circumstances constitute reasonable interim employment for mitigation purposes.

Tubari in turn suggests that, for policy reasons, picketing is an impermissible form of interim employment for mitigation purposes, a public policy contention that we will address first. The mitigation doctrine is "rooted in an ancient principle of law," *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982) (footnote omitted). But in the context of unfair labor practices discharges the doctrine is infused with federal labor law; hence the vindication of private rights is subordinate to public policy. *See Kenrich Petrochemicals,* 907 F.2d at 406; *NLRB v. Madison Courier, Inc.,* 505 F.2d 391, 398 (D.C.Cir.1974) (*Madison Courier II*). As Justice Frankfurter noted in *Phelps Dodge,* the mitigation doctrine as applied in labor law furthers "the healthy policy of promoting production and employment." 313 U.S. at 200, 61 S.Ct. at 855. *See also Madison Courier I,* 472 F.2d at 1317. Accordingly, while lawful picketing may be a proper means of combating a particular employer's unfair labor practices, it cannot fairly be said that picketing is activity which promotes production and employment.

1. In an analogous setting under Title VII, the Supreme Court, relying on cases decided under the National Labor Relations Act has stated that, "[a]lthough the unemployed ... claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982) (footnotes omitted).

However, the fact that a discriminatee's securing of picketing employment is inherently a questionable method of mitigation, does not necessarily indicate that the Board's determination that picketing may constitute interim employment "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." In fact, courts of appeals as well as the Board have long held, either directly or by necessary implication, that where payments from a union to a discriminatee are contingent upon picketing, the sums received are interim earnings deductible from backpay. *See, e.g., NLRB v. Laidlaw Corp.*, 507 F.2d 1381, 1382–83 (7th Cir.1974) (affirming Board's refusal to deduct from backpay sums received from union for picketing since the "monies disbursed by the union were not contingent on picketing time"), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *NLRB v. My Store, Inc.*, 468 F.2d 1146, 1150 (7th Cir.1972) (payments received from union for picketing "would ... qualify as collateral strike benefits and exempt as interim earnings unless received as a condition precedent to, or in compensation for, picketing or other services"), *cert. denied*, 410 U.S. 910, 93 S.Ct. 965, 35 L.Ed.2d 271 (1973); *Golay & Co. v. NLRB*, 447 F.2d 290, 295 (7th Cir. 1971) ("the Board could properly decline to deduct from back pay benefits employees received from their union in the relevant period, since the employees furnished no services, such as picketing, in exchange for the union payments"), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 737, 30 L.Ed.2d 745 (1972); *Florence Printing Co. v. NLRB*, 376 F.2d 216, 218–20 (4th Cir.) (same), *cert. denied*, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967); *NLRB v. Rice Lake Creamery Co.*, 365 F.2d 888, 892 (D.C.Cir. 1966) (same); *NLRB v. Brashear Freight Lines, Inc.*, 127 F.2d 198, 199 (8th Cir.1942) (same); *Superior Warehouse Grocers, Inc.*, 282 N.L.R.B. 802, 804 (1987) (since

money received from union was contingent on picketing it "was in the nature of pay for interim employment," therefore discriminatee was entitled to backpay less the amount received); *Florida Steel Corp.*, 234 N.L.R.B. 1089, 1092 (1978) ("The applicable law is well settled that where strike benefits received by a claimant constitutes wages or earnings resulting from interim employment they are proper deductions from gross pay. However, if these sums represent collateral benefits flowing from the association of the claimant with the Union, they are not deductible[.]"), *enf'd*, 586 F.2d 840 (5th Cir.1978) (table). Thus, a holding that a discriminatee is prohibited in all instances from engaging in picketing as interim employment to satisfy his or her duty to mitigate would be contrary to well-established precedent that the Board may deduct from backpay monies received for picketing.[2]

In this case the Board noted that, while the discriminatees had a statutory right to protest Tubari's unfair labor practices through picketing, it was not necessary to consider the object of their picketing in determining whether they reasonably mitigated losses. Rather, the Board considered the traditional factors such as the employees' skills, experience and rate of pay. As the Board found these discriminatees to be unskilled, it properly exercised its discretion in determining that picketing by the discriminatees could possibly have been suitable interim employment.

■ Although a discriminatee *may* be justified in picketing as a means of achieving interim employment and mitigating damages, the factual circumstances surrounding the discriminatees' acceptance of picketing employment must be thoroughly examined. Accordingly, the narrow question presented here is whether the Board abused its discretion in determining that picketing was reasonable interim employment considering that the discriminatees earned approximately 66% of their former

---

**2.** We note that to an extent Tubari has benefited from this precedent as the Board has deducted from its backpay order the wages paid by the union to the discriminatees.

wages, were unskilled workers and did not look elsewhere for alternative work.[3]

Not surprisingly, Tubari supports its contention that the picketing did not constitute suitable interim employment with the citation of *Madison Courier I,* a case which set aside a Board's decision rejecting the employer's arguments that the discriminatees did not mitigate. In *Madison Courier,* the union paid the discriminatees strike benefits "roughly comparable" to their prior weekly take-home pay, but it required the discriminatees to be available for picket line and other strike-related duties which usually lasted about two hours per day, Monday through Saturday. 472 F.2d at 1313 & n. 12. In considering these facts, the court stated:

> The fact that unfair labor practice strikers received strike benefits does not diminish their right to receive back pay, *providing* they otherwise made reasonable efforts to locate suitable interim employment. Likewise, the fact that such persons engaged in picketing during the back pay period does not automatically negate their right to reimbursement by their employer. However, like the receipt of strike benefits, picket line activity does *not* relieve the discriminatees of the obligation of making reasonable efforts to obtain appropriate interim employment.

472 F.2d at 1320 (footnotes omitted) (emphasis in original). Tubari understandably relies heavily on this statement, inasmuch as none of the discriminatees in this case "otherwise made [*any*] efforts to locate suitable interim employment."

Notwithstanding certain similarities between *Madison Courier I* and this case, they differ fundamentally, for there the court assumed that the union's payments were benefits rather than wages and never considered whether picketing could itself constitute interim employment. This, of course, is completely understandable since the two-hour picketing stint, yielding wages "roughly comparable" to what the

discriminatees previously earned, was hardly comparable to ordinary employment. Thus, the court merely recognized the settled principles that a discriminatee is not excused from seeking interim employment on account of his or her picketing activities and that strike benefits are not deductible from backpay. *See id.* at 1322 & n. 51; *id.* at 1325. Furthermore, inasmuch as the court found that the discriminatees were skilled workers, *id.* at 1323, this constitutes an additional reason why it failed to consider whether picketing could constitute *suitable, i.e.,* substantially equivalent, interim employment.

■ The *Madison Courier I* court also discussed the "lower sights" corollary to the mitigation doctrine, which holds that, after unsuccessfully attempting for a reasonable period of time to secure substantially equivalent interim employment, a discriminatee is required to "lower his sights" by seeking less remunerative work. *See id.* at 1321; *Madison Courier II,* 505 F.2d at 402–04; *NLRB v. Southern Silk Mills, Inc.,* 242 F.2d 697, 699 (6th Cir.), *cert. denied,* 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957); *Seattle Seahawks and SSI, Inc.,* 304 N.L.R.B. No. 78 (August 27, 1991); *Delta Data Systems Corp.,* 293 N.L.R.B. 736 (1989). But the duty to lower one's sights arises only after a reasonably diligent search for employment similar to that lost has been made. Doubts as to whether or when a discriminatee must lower his or her sights are resolved against the employer. *Madison Courier I,* 472 F.2d at 1321. Here Tubari contends that the discriminatees willfully incurred losses by immediately accepting employment that provided significantly less remuneration than they had received from Tubari, an instant lowering of sights.

The tension between a discriminatee's duty to seek substantially equivalent interim employment and the subsequent duty to lower his or her sights after a "reasonable" period of time has been noted by courts

---

**3.** The Board did not expressly find that the discriminatees earned approximately 66% of their former wages while picketing. What it did conclude was that the administrative law judge's finding that they were paid almost 75% of their former wages was too high. Tubari has made

the 66% calculation in its brief, a contention the Board accepts in its brief, as it asserts that "the discriminatees still earned over 65% of the wages they would have received but for [Tubari's] unlawful action."

and by the Board. As stated in *Madison Courier I:*

> If the discriminatee accepts significantly lower-paying work too soon after the discrimination in question, he may be subject to a reduction in back pay on the ground that he willfully incurred a loss by accepting an 'unsuitably' low-paying position. On the other hand, ... if he fails to 'lower his sights' after the passage of a 'reasonable period' of unsuccessful employment searching, he may be held to have forfeited his right to reimbursement on the ground that he failed to make the requisite effort to mitigate his losses.

472 F.2d at 1321.

It is therefore not surprising that the Board has been particularly sensitive to the fact that employers will sometimes fault a discriminatee for accepting a lower-paying job too soon, yet if the discriminatee did not accept such a job, for not lowering his or her sights soon enough. *See, e.g., Delta Data Systems Corp,* 293 N.L.R.B. at 738 ("in an ironic twist, wrongdoers have been inspired to seek a reduction in monetary liability on grounds that a discriminatee's acceptance of a lower paying job occurred too soon ... [putting discriminatees in a] 'damned if they do, damned if they don't'" situation); *Stringfellow's of New York, Ltd.,* No. 2–CA–22439, —— NLRB ——, 1989 WL 224293, 1991 NLRB LEXIS 1120, *32 (August 30, 1991) ("I find that it is likely that if [the discriminatee] had refused this [lower paying] offer of employment ..., Respondent would be defending that its backpay obligations should end because he refused interim employment.").[4] Thus, because of the vagueness of this standard and the fact that the doctrine compels victims of illegal discrimination to accept a lower standard of living, as well as other "serious questions of fairness," *Delta Data Systems Corp.,* 293 N.L.R.B. at 738, the Board has indicated that "the duty to lower sights should be acknowledged upon only the clearest evidence of abuse." *Id.*

Notwithstanding the vagueness of the "reasonable period of time" standard, we are aware of no case which has determined that an employee was reasonably diligent in accepting a materially lesser-paying position where, as here, he or she has not undertaken *any* search for substantially equivalent employment.[5] In this case the Board relied on *Marlene Industries Corp.,* 234 N.L.R.B. 285 (1978), in holding that the discriminatees' mitigation efforts were reasonable. The Board noted that in *Marlene Industries,* the administrative law judge whose decision was adopted, found that the discriminatee's job as a "presser" was not so highly skilled or highly paid that he would be required to seek only presser work in order to establish mitigation.[6] The

---

**4.** *See also Firestone Synthetic Fibers and Textile Co.,* 207 N.L.R.B. 810, 815 (1973) (footnote omitted):

> Of course a discriminatee should not recklessly accept lower paying employment. But his judgment in that regard should not be lightly treated as a wilful loss of earnings. It must be kept in mind that he is required to seek suitable employment, and that under certain circumstances he is required to 'lower his sights' and accept less desirable and less remunerative employment. Caught between these two pincers, a discriminatee who seeks and accepts interim employment in good faith should not be penalized for his anxiety to comply with the dictates of the Board and the courts, or because he succumbs to compelling financial pressures, or even if he exercises what to the comfortably employed or affluent may seem bad and hasty judgment.

**5.** The court in *Lundy Packing* stated that "[a] failure to retain interim employment that is substantially less remunerative than his previous job does not provide a basis for reducing a worker's back pay award." 856 F.2d at 630. However the court was careful to preface this statement by noting that the discriminatees previously undertook "otherwise diligent searches for full-time employment...." *Id.* at 629–30. Similarly, in *Chem Fab Corp.,* 275 N.L.R.B. 21 (1985), to which the *Lundy Packing* court cites, the Board adopted the finding of an administrative law judge that the two discriminatees did not willfully lose earnings where one sought employment from 85 or more different employers and the other sought work from at least 39 firms and, in addition, made numerous visits to the state unemployment office. *Id.* at 24 & n. 19.

**6.** The discriminatee in *Marlene Industries,* like the discriminatees here, accepted wages from the union for picketing as interim employment.

Board here found that the discriminatees were similarly unskilled and that "[a]ccepting a 'bird in the hand' for steady pay that was less than what they had earned in the jobs from which they were unlawfully discharged was not unreasonable." *Tubari Ltd., Inc.*, 303 N.L.R.B. No. 86, at 5. The Board also found "the discriminatees' earnings not so relatively small as to warrant the conclusion that their earnings from their picketing activity do not constitute mitigation." *Id.*

While an unskilled discriminatee surely need not, and should not, confine his or her search for interim employment to the same line of work from which he or she was terminated, the Board did not adequately consider whether the discriminatees' *immediate* acceptance of a one-third reduction in wages without seeking other work constituted a willful loss of earnings. *Marlene Industries*, on which the Board relies, is distinguishable. In that case, while it was not unreasonable for the discriminatee to engage in paid picketing instead of his former line of work, the Board noted that there was only a $0.29 difference between the hourly wages paid by the union and his former employer. 234 N.L.R.B. at 289.[7] Moreover, in *Marlene Industries* the Board found that the discriminatee made diligent efforts in seeking other employment after his discharge as evidenced by the fact that he immediately sought and obtained (non-picketing) employment after he was discharged and ultimately secured a total of three jobs during the backpay period. *Id. See also Chem Fab Corp.*, 275 N.L.R.B. at 24 n. 19 (rejecting contention that discriminatee willfully incurred losses where discriminatee sought employment from some 85 employers).

There is, of course, no requirement that in seeking interim employment a discriminatee must secure equal or greater wages than his or her former salary. Indeed, the Board has held that a discriminatee who accepts suitable interim employment, even at a lower wage, has no continuing duty to search for a more lucrative job. *See, e.g., F.E. Hazard, Ltd.*, 303 N.L.R.B. No. 130, at ——, 1991 WL 148191, 1991 N.L.R.B. LEXIS 880 at *4 (July 23, 1991) ("Once a discriminatee has embarked on a legitimate course of interim employment, there is no duty to search for more lucrative interim employment."); *Sioux Falls Stock Yards Co.*, 236 N.L.R.B. 543, 570 (1978) ("It is well established that an employee who accepts appropriate interim employment, even at a lower rate of pay, is not required to search for better employment.") (footnote omitted).[8] Yet the determination as to whether a particular interim employment is "suitable" is often intertwined with the issue of whether the discriminatee has exercised reasonable diligence. Indeed, the Board's decisions reflect significant fact-finding efforts in backpay hearings evaluating the discriminatee's diligence in seeking interim employment. However, while the Board and the courts have sanctioned a discriminatee's acceptance of a lesser paying job, we are aware of no case in which a discriminatee has been held to have reasonably mitigated damages by immediately lowering his or her sights in terms of remuneration without first undergoing a reasonably diligent, good faith effort at securing substantially equivalent employment. Here the discriminatees made no effort at all to secure substantially equivalent employment, and thus we could uphold the Board only by significantly altering the equation of rights and responsibilities regarding mitigation following an unlawful discharge. We decline to do that.

In reaching our result, we realize that the Board's opinion may be read as a finding that the picketing was substantially equivalent to the discriminatees' prior employment, as they were unskilled and it would have been reasonable for them to

---

7. The difference here, by contrast, was approximately $2.23 per hour.

8. *But cf. Seattle Seahawks, supra*, 1991 WL 178177, 991 N.L.R.B. LEXIS at *55 (although a discriminatee is entitled at a point to lower his or her sights, "at no point has it been held that once a claimant's sights are lowered, that claim-ant is thereafter absolved altogether [from] accepting subsequently disclosed comparable employment nor, for that matter, from continuing to seek comparable interim employment to the extent that a generalized search for it does not disrupt a more realistic effort to locate less remunerative, but more certain, work").

have accepted a wide range of work. But in our view the immediate acceptance of a one-third reduction in pay without undertaking any search for alternative employment, either in the same line of work or elsewhere, indicates that the discriminatees' efforts were not reasonably diligent. *See Iron Workers*, 804 F.2d at 1102. We further point out in this regard that the very fact that the discriminatees were unskilled may have made it easier for them to find substantially equivalent employment.[9]

We recognize that a court or the Board in viewing a discriminatee's judgment in accepting interim employment necessarily has the clarity of hindsight. Nonetheless, it is for this very reason that a discriminatee need only show reasonable diligence by making a good faith effort in securing suitable interim employment. Moreover, as we have indicated, any doubt is resolved against the employer who is, after all, the wrongful party in a backpay inquiry. In the context of this case, while picketing at $150 per week would have been reasonable for an unskilled worker after having made (or while in the process of making) reasonably diligent efforts at securing better-paying work, we are confident that a discriminatee who immediately accepts a one-third reduction in pay without making any effort to secure alternative suitable interim employment has not exercised reasonable diligence. While the Board in its brief characterizes the picketing as "a slightly lower

paying job" than the discriminatees' former employment, we are at an absolute loss to understand the basis for that characterization, for a one-third reduction in earnings is substantial by any reasonable standard. Thus, unless the lower sights doctrine could be applied here, which is not the case because the employees have not undertaken a reasonably diligent search, the picketing cannot possibly be regarded as suitable interim employment. We bolster our conclusion that the discriminatees did not exercise reasonable diligence by our recognition that the employment in question is picketing activity which, while not in itself unreasonable, does not further the primary policies underlying the mitigation doctrine.

Finally we note that, although Tubari has not submitted proof that other work was available and it is normally the employer's burden to establish this element of mitigation, as we have indicated above this is irrelevant where, as here, the discriminatees made no search for comparable interim employment. *Madison Courier I*, 472 F.2d at 1319; *accord Seattle Seahawks, supra*, 1991 WL 178177, 1991 NLRB LEXIS at *56–*57.[10]

## III.

## CONCLUSION

Accordingly, the petition for review will be granted and the Board's supplemental

---

**9.** At oral argument, we explored the question as to whether there could be a bright line drawn determining the percentage of the prior wage represented by the interim wage, so as *per se* to constitute substantially equivalent employment. We are not able to draw that line, but wherever it may be, we are satisfied that the reduction in pay in this case was so significant that the discriminatees were not relieved of the obligation to make the slightest effort to find substantially equivalent employment.

**10.** In concluding that we have "disregard[ed] the well-settled authority which places the duty of showing a failure to mitigate on the employer[,]" dissent at 460, the dissent overlooks the equally well-settled authority which holds that an employer meets this burden by establishing that the discriminatee has willfully incurred losses by withdrawing from the employment market or by otherwise failing to make a *reasonable* search for *suitable* interim employment. In essence, the dissent would hold that an im-

mediate one-third reduction in pay constituted a reasonable search for suitable interim employment and that the fact that this employment happened to be picketing activity is irrelevant in the context of unskilled workers. However, as discussed above, in view of the mitigation doctrine's underlying policy of furthering production and employment, we think it entirely appropriate in assessing a discriminatee's mitigation efforts to consider the fact that the employment in question was picketing. Thus, we have in no way altered the established requirement of mitigating damages which applies to both skilled and unskilled workers alike. While we recognize that individuals will take different steps depending upon their vocations, we merely hold that, by accepting (1) a substantial reduction in pay (2) for picketing activities and (3) without undergoing any other search for comparable employment, the discriminatees in this case did not satisfactorily mitigate their damages.

decision and order awarding backpay less interim earnings will be set aside and we will deny enforcement of the decision and order.

CLIFFORD SCOTT GREEN, Senior District Judge, dissenting.

As the majority acknowledges: (1) it is well-settled that "where payments from a union to a discriminatee are contingent upon picketing, the sums received are interim earnings deductible from backpay." Majority at 455 (citations omitted); (2) the burden of establishing a failure to mitigate is on the employer rather than the employee. *Id.* at 453–54 (citing *Lundy Packing Co. v. NLRB*, 856 F.2d 627, 629 (4th Cir. 1989); *Iron Workers Local 118, etc. v. NLRB*, 804 F.2d 1100, 1102 (9th Cir.1986); *NLRB V. Pilot Freight Carriers, Inc.*, 604 F.2d 375, 377 (5th Cir.1979)); (3) an employer meets this burden by "establishing that the employee has willfully incurred losses through *unjustifiably refusing* adequate interim employment." *Id.* (emphasis added) (citing *Phelps Dodge*, 313 U.S. 177, 198–200, 61 S.Ct. 845, 854–55, 85 L.Ed. 1271 (1941)); (4) that because of its expertise, decisions of the National Labor Relations Board (the Board) in fashioning remedial relief are entitled to deference. *Id.* at 453. (citing *NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 346–47, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953); *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964)).

After acknowledging that Tubari, the employer, failed to produce evidence that other employment was available, the majority finds the failure irrelevant because the employees did not search for additional employment, and concludes that the Board erred in finding that full-time paid picketing work constitutes suitable interim employment acceptable as mitigation of damages for Tubari's violation of the National Labor Relations Act (the Act). Because I believe that the holding of the majority is not supported by the evidence, disregards established authority, and fails to give proper deference to the expertise of the Board, I respectfully dissent.

The record does not support the majority's finding of fact that these employees made no search for comparable interim employment. After being unlawfully discharged, these unskilled employees sought and accepted paid picketing positions. They were required to picket and did in fact picket daily from 7:30 a.m. to 3:30 p.m. In consideration for their services they were compensated at a rate of $150.00 per week plus $25.00 per week for lunch money. The Board reduced the amount of the award to each employee by giving Tubari credit for the full amount of earnings received ($175.00 week). Since these facts are undisputed, the finding of the majority that the employees made no search for comparable interim employment is without evidentiary support.

Nor will the evidence support a finding that the accepted unskilled employment was not suitable. The majority suggests that picketing is not productive employment; however, it does not conclude that the type of employment accepted was unsuitable for these unskilled employees. Instead, the majority focuses on the amount of compensation received, essentially concluding, without evidence, that the employees could possibly have done better. In reaching this conclusion, the majority disregards the well-settled authority which places the duty of showing a failure to mitigate on the employer.

The majority's justification for relieving Tubari of its burden is that the employees withdrew from the employment market by not continuing to seek other employment. I find the stated reason for denying the discriminatees their remedy for the unlawful conduct of Tubari to be without merit where, as here, the discriminatees ceased to continue their search for alternative employment only after accepting the full-time picketing positions. Moreover, the withdrawal finding is surprising since the majority acknowledges that the employees were not free to decline the accepted employment except at the peril of being totally denied compensation because of the failure to mitigate damages.

In the view of the majority, these wrongfully discharged, unskilled employees are barred from their remedy under the Act because they did not, after working all day, seek alternative employment at night. It is

significant that the majority cites no authority for placing such a burden on the victims. Indeed, the cases cited by the majority hold the opposite. The majority recognizes that the established case law holds that a discriminatee has no duty to continually search for employment of equal or greater pay. Majority at 458 (citing *F.E. Hazard, Lt.*, 303 N.L.R.B. No. 130, at ——, 1991 WL 148191, 1991 N.L.R.B. LEXIS 880 at *4 (July 23, 1991) ("Once a discriminatee has embarked on a legitimate course of interim employment, there is no duty to search for more lucrative interim employment"); *Sioux Falls Stock Yards Co.*, 236 N.L.R.B. 435, 570 (1978) ("It is well established that an employee who accepts appropriate interim employment, even at a lower rate of pay, is not required to search for better employment.") (footnote omitted)). Still, in the face of these established legal principles, the majority concludes that the discriminatees did not properly mitigate their damages. This conclusion relieves Tubari of its obligation to compensate the victims of its wrongdoing and deprives the employees of their remedy.

I believe that unskilled employees will find the majority's requirement for mitigation to be a virtually impossible obstacle to overcome in their quest for a meaningful remedy. Unfortunately, the majority does not clearly inform these unskilled employees of the additional steps that must be taken to mitigate damages. Perhaps a professional or highly skilled employee will be able to meet the requirement by retaining the services of an employment consultant, sending out employment resumes, or arranging with a prospective employer a mutually convenient time for an interview. Of course, the unskilled laborer has no such options; for the unskilled laborer employment is obtained usually by reporting to the work site, at the start of the work day, prepared to work. Clearly, the discriminatees employed from 7:30 A.M. to 3:30 P.M. could not so report. The National Labor Relations Board, experienced in labor matters, apparently recognized the limited opportunity for unskilled employees to both work full time and seek alternate interim employment. The Board assessed all the relevant factors and concluded that the discriminatees had mitigated damages by accepting suitable interim employment which paid at least 65% of their former wages. The Board's decision is supported by the record and established authority. The decision is entitled to deference and in my opinion the order of the Board should be enforced.