**George J. RAIMONDO**

**v.**

**AMAX, INC.**

**Civ. No. 5-88-163 (WWE).**

United States District Court, D. Connecticut.

Jan. 14, 1994.

Stewart M. Casper, Casper & De Toledo, Stamford, CT, Walter B. Connolly Jr., Miller, Canfield, Paddock & Stone, Detroit, MI, Victoria De Toledo, Casper & De Toledo, Stamford, CT, William I. Haslun II, Ivey, Barnum & O'Mara, Greenwich, CT, Edward T. Krumeich, Ivey, Barnum & O'Mara, Greenwich, CT, Alison B. Marshall, Miller, Canfield, Paddock & Stone, Washington, DC, Alison B. Marshall, Miller, Canfield, Paddock & Stone, Detroit, MI,

## *MEMORANDUM OF DECISION*

EGINTON, Senior District Judge.

Plaintiff, George Raimondo, brought this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., alleging that the defendant fired him because of his age. On January 16, 1992, a jury found in favor of the plaintiff and awarded $201,864 in back pay and $234,339 for loss of pension. The instant ruling concerns only the issue of front pay damages. Following hearings that were held over the course of several months, the court enters the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

### *Findings of Fact*

In August 1986, Climax Metals Company, a division of defendant, AMAX, Inc., fired plaintiff from his position as a minerals market analyst.[1] Plaintiff worked in defendant's corporate offices in Norwalk, Connecticut. He was 55 years of age and earned $60,748. Plaintiff was unable to obtain another position with defendant and enrolled with Lee Hecht Harrison ("Lee Hecht"), an outplacement firm retained by defendant.

1. Plaintiff commenced his employment with defendant on October 5, 1966.

As part of the Lee Hecht program, plaintiff received individual counseling, help in preparing his resume, and full secretarial services. Lee Hecht also provided plaintiff with a job search manual. The manual included information on resume and cover letter writing, interviewing, approaching the published and unpublished job markets, networking, and researching the marketplace. Lee Hecht informed plaintiff that he should retain copies of all correspondence and materials relating to his job search efforts. He did not perform this last task efficiently.

Lee Hecht instructed plaintiff that seventy-five percent of available jobs are in the unpublished job market and that a job seeker gains access to this market through networking. Appropriately, plaintiff did focus on the unpublished job market. Using various sources, plaintiff developed lists of companies to contact about employment possibilities. He then attempted to ascertain the name of a specific individual at each company to use as a contact. Dick Willett, the Lee Hecht counselor assigned to plaintiff, wrote in a March, 1987, report, that "George has now been in the process for eight months. [He uses] our facility on a daily basis and is constructively working his network." In a summary report, Willett stated that plaintiff had worked aggressively and had made contacts in the market research community, but concluded that business prospects in this field were poor. Indeed, plaintiff did not obtain a job from the unpublished market.

Lee Hecht guided plaintiff on proper methods for addressing the published job market. Lee Hecht told plaintiff how to answer blind advertisements, to register with executive recruiting firms, and to conduct a self-marketing campaign. When approaching a blind advertisement, a job seeker should, if possible, research the company and position, and draft a tailored cover letter. Following these suggestions is fundamental for success in the published market.

Plaintiff generally followed these suggestions. Rather than merely responding blindly to advertisements, plaintiff attempted to research the positions and tailor his responses. When he was unsuccessful in uncovering a contact or information about a company, plaintiff often sent a general response. Plaintiff did not have success in the published job market.

Plaintiff also pursued consulting. In addition to offering prospective employers his services on a consulting basis, plaintiff attempted to start his own consulting business. In this regard, plaintiff prepared a marketing brochure and incurred other expenses. This endeavor was not fruitful.

Plaintiff was diligent in his efforts during most of his first year of unemployment. He did not limit the area of his search to the Northeast. Nonetheless, plaintiff did not find a market research position or, for that matter, a position in a number of arguably related fields. He even attempted to work as a recruiter himself, but made no money. His job search efforts then declined.

Desperate, plaintiff took a position as a limousine driver in June, 1988. Although not at the level he had maintained in 1987, plaintiff continued his job search. Finally, in October, 1989, plaintiff obtained a position in his field with Reed/Cahners Publishing Company ("Cahners"). Plaintiff still works for Cahners. In 1992, he earned $27,974, and in 1993, $30,633.

If plaintiff's fortunes have been poor, defendant's have been close to abysmal. Defendant's 1980 pre-tax earnings were $469 million. In 1992, its earnings were three million. In 1979, defendant had approximately 7000 employees. In 1993, it had fewer than 1000. The number of employees in the area where plaintiff worked went from forty to four. Defendant froze salaries in 1991, capped them for exempt employees at 3.75 percent in 1992, and froze them again in 1993. In 1993, defendant lost from $500,000 to $1,000,000 each month.

In November, 1993, Cyprus Minerals Company purchased AMAX. On December 30, 1993, in connection with the sale of AMAX, defendant's corporate offices in Norwalk permanently closed. Ninety percent of the employees who worked in Norwalk lost their jobs. Only one person from plaintiff's former work group received a relocation offer. Plaintiff would have lost his job December 30, 1993.

Had defendant not terminated plaintiff in 1986, his salary would have increased by 3.8 percent per year. As for bonuses, in 1981, plaintiff earned a bonus of $5,000, 9.8 percent of his salary. In 1982, he received a bonus of $3,265, 5.9 percent of his salary. He did not receive any bonuses from 1983 through 1986. On average, defendant has paid only small bonuses to its employees since plaintiff's departure.

### *Conclusions of Law*

As a threshold matter, a plaintiff may not gain an award of front pay damages unless reinstatement is unsuitable and he "has no reasonable prospect of obtaining comparable alternative employment." *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 726 (2d Cir.1984). The parties agree that reinstatement is not appropriate in this case. Given the state of the market, plaintiff does not have a reasonable prospect of finding a job comparable in terms of compensation to that which he lost in 1986.

### *Mitigation of Damages*

A plaintiff in an age discrimination lawsuit has a duty to mitigate damages. This duty requires a plaintiff to exercise reasonable diligence in seeking other suitable employment. The law does not require the aggrieved party to accept a lesser position, but does require a deduction from front pay awards of all actual earnings. The former employer must prove that "suitable work existed, and that the employee did not make reasonable efforts to obtain it." *Clarke v. Frank,* 960 F.2d 1146, 1152 (2d Cir.1992). The goal of mitigation is to prevent the plaintiff from remaining idle and doing nothing. *Whittlesey,* 742 F.2d at 728. A court may consider the plaintiff's background and individual characteristics when evaluating the reasonableness and duration of a job search. *Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614, 624 (6th Cir.1983) (for example, older claimants need not exert same effort as younger claimants), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984); *Sellers v. Delgado College,* 902 F.2d 1189, 1193 (5th Cir.1990), *cert. denied,* 498 U.S. 987, 111 S.Ct. 525, 112 L.Ed.2d 536 (1990).

In the present case, plaintiff exerted substantial efforts in his job search during the end of 1986 and most of 1987. Then, while working as limousine driver, he continued his search, though at a diminished level. Given the state of the market and the plaintiff's age, his search was reasonable. He was not under a duty to continue a thorough search after obtaining a position in his field with Cahners. Since obtaining this position, plaintiff has billed approximately thirty-five hours per week performing market analysis. This is not a situation where a disgruntled former employee simply remained idle. Nor is it a case where a fired employee immediately accepted a lower paying job without first using reasonable efforts to secure comparable employment. *Tubari Ltd., Inc. v. NLRB,* 959 F.2d 451, 458 (3d Cir.1992). Plaintiff has mitigated his damages.

### *Damages*

A plaintiff "may not recover damages for [a] period beyond which [he] would have been terminated for a nondiscriminatory reason." *Bonura v. Chase Manhattan Bank, N.A.,* 629 F.Supp. 353, 356 (S.D.N.Y.1986); *see also Association Against Discrimination v. City of Bridgeport,* 647 F.2d 256, 289 (2d Cir.1981) (period for backpay award ended on date nondiscriminatory reason made aggrieved party ineligible for job), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982). In the instant case, the court will award damages for a period beginning January 16, 1992, and ending December 30, 1993, as that is the date plaintiff would have lost his job with defendant for a nondiscriminatory reason.

1. Salary

As noted above, plaintiff's salary would have increased at a rate of 3.8 percent per year. Based on this calculation, plaintiff would have made $72,661 in 1992, from January 16th, and $78,870 in 1993.

2. Bonuses

Defendant's bonus system is not mandatory. Plaintiff did not receive a bonus in each year of his employment with defendant. In fact, he did not receive a bonus in any of his last four years of employment with defendant. Any calculation of a lost bonus award would be purely speculative and inappropriate. *Bonura,* 629 F.Supp. at 361.

3. Vacation Pay, Insurance Costs and Savings Contributions

Plaintiff also seeks awards for vacation pay, insurance costs and savings contributions. Defendant does not pay employees separately for vacations. As the court will award plaintiff front pay for lost salary, he is not entitled to a supplemental award of vacation pay.

Where a plaintiff purchases substitute insurance after being unlawfully terminated, or incurs out-of-pocket medical costs that would have been covered under his former employer's policy, a court may award damages. *Bonura,* 629 F.Supp. at 359; *Syvock v. Milwaukee Boiler Mfg. Co., Inc.,* 665 F.2d 149, 161 (7th Cir.1981) (award of health benefits is discretionary). Neither situation occurred in the present case. The court will not award plaintiff damages for insurance costs.

Defendant apparently does not contest plaintiff's argument regarding his entitlement to an award for lost savings plan contributions. In any event, this is a compensable benefit in an age discrimination case. *Buckley v. Reynolds Metals Co.,* 690 F.Supp. 211, 220 (S.D.N.Y.1988). Under defendant's savings contribution plan, the company matches 75 percent of an employee's contributions. An employee may contribute up to six percent of his salary. Using this formula, the court will award plaintiff $3269 for 1992, and $3569 for 1993.

4. Pension Plan and Social Security Offset

A. Calculation of pension

| As of 12/30/93 | | |
|---|---|---|
| High average three years | = | $76,018 |
| Social Security Offset | = | $ 3,787 |
| Years of service | = | 27.23 |

Under the AMAX pension benefit formula, plaintiff's net annual pension is $33,382.[2]

B. Life Expectancy

The court adopts plaintiff's use of life expectancy tables and finds, for the purposes of this decision, that plaintiff will live until July, 2010.

5. Discount Factor

Where there is an award of future damages, the court must reduce the future award to its present value. This requires a determination of the appropriate discount rate. *Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30 (2d Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). In the instant action, since the front pay period ended December 30, 1993, there is no need to discount the damages for lost savings contributions. As for lost salary and pension, the court finds plaintiff's discount rate to be reasonable. Additionally, the court finds plaintiff's estimates of pension offsets to be appropriate.

After off-setting lost earnings and discounting to present value, the court will award plaintiff $48,075. See Appendix.

### *Conclusion*

The court concludes that damages shall be awarded as follows:

| | |
|---|---|
| Lost Earnings | $48,075 |
| Savings Contribution | $ 6,838 |
| NET FRONT PAY AWARD | $54,913 |

2. In determining annual pension, the court followed the five step formula provided on page four of defendant's pension plan manual. Plaintiff's Exhibit 21. The relevant numbers used were those listed above. Notwithstanding the complexity of the formulas used to determine plaintiff's annual pension and social security offset, the court deems its figures to be reasonable.