Jack G. BUNCHER, d/b/a The Buncher
Company, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

United Steelworkers of America,
AFL–CIO, Intervenor.

No. 16638.

United States Court of Appeals
Third Circuit.

Argued March 8, 1968.

Decided June 27, 1968.

Reargued Nov. 25, 1968.

On Rehearing Jan. 20, 1969.

———◆———

John G. Wayman, Reed, Smith, Shaw
& McClay, Pittsburgh, Pa. (Scott F.
Zimmerman, Reed, Smith, Shaw & Mc-
Clay, Pittsburgh, Pa., on the brief), for
petitioner.

George H. Cohen, Bredhoff & Gottesman, Washington, D. C. (Elliot Bredhoff, Michael H. Gottesman, Washingon, D. C., Bernard Kleiman, Chicago, Ill., on the brief), for intervenor.

Arthur Horowitz, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, George B. Driesen, Atty., N. L. R. B., on the brief), for respondent.

Elliott Moore, N. L. R. B., Washington, D. C., for respondent on rehearing.

Before HASTIE, Chief Judge, and BIGGS, KALODNER, FREEDMAN, SEITZ, VAN DUSEN, ALDISERT and STAHL, Circuit Judges.

## OPINION ON REHEARING OF THE COURT EN BANC

SEITZ, Circuit Judge.

This is the decision on the Company's petition to review and set aside a supplemental backpay order of the National Labor Relations Board and the Board's request for its enforcement.

The present dispute arises out of a finding, approved by this court, that the Company had dismissed certain of its employees in violation of the Act. N. L. R. B. v. Buncher, d/b/a The Buncher Company, 316 F.2d 928 (3rd Cir. 1963). The Regional Director thereafter issued a backpay specification and Notice of Hearing formulated in accordance with § 102.52 of the Board's Rules and Regulations. It contained a statement of the dollar amounts allegedly due each discriminatee as well as the following statement of the method employed by him in determining whether the discriminatees would have been discharged in any event for purely economic reasons after May 12, 1960:

"2. The first reduction in force at the Respondent Company's Nine Mile Run facility subsequent to March 4, 1960, occurred on May 12, 1960.

"3. Each of the discriminatees was entitled to backpay in accordance with the weekly average hours worked by the employees of Respondent at the Nine Mile Run facility until May 12, 1960.

"4. When there was not sufficient work available at the Nine Mile Run facility after May 12, 1960 for all of the discriminatees and all of the other employees who were employed at the Nine Mile Run facility at the time of the discrimination, an appropriate method of determining each discriminatee's entitlement to backpay during the period after May 12, 1960 is:

"(a) By allocating the available jobs at the Nine Mile Run facility among the discriminatees and the aforesaid other employees in accordance with their seniority; and

"(b) Only when sufficient work was not available at the Nine Mile Run facility for a discriminatee, then by allocating the available jobs at all of Respondent's locations, namely, Nine Mile Run, Leetsdale and Yard, among the discriminatees and the other employees who were employed at all of said Respondent's locations at the time of the discrimination in accordance with their seniority.

"5. The seniority referred to in paragraph 4 above is based on an employee's most recent hiring date with Respondent.[1]"

"1. An interruption of an employee's employment for a period of seven consecutive days or less is not deemed to constitutes a break in seniority."

\* \* \*

The Company filed a response to the specifications in which it challenged the position that seniority was a permissible basis for calculating the backpay. It listed some ten criteria which it indicated were utilized by it to determine whether to retain or re-employ employees. It attached a chart purporting to apply the criteria to the discriminatees, retained employees, and employees first hired during the backpay period. It was admitted, however, that the chart was prepared after the fact on the basis of personal recollections by the Company's su-

pervisors concerning 225 employees over a four and one-half year period.

Thereafter the matter came on for hearing. The Company sought to establish the validity of the chart attached to its response by the testimony of its supervisors. The trial examiner found that no employee was entitled to backpay for the period after May 12, 1960. He so concluded because the backpay claims were based on "seniority", whereas the Company did not use seniority in effectuating reductions in force. The Board reversed and remanded holding that "an absence of the use of seniority by the Respondent does not render the General Counsel's utilization of seniority in this proceeding unreasonable, per se."

Upon remand the trial examiner first considered the Company's evidence in support of its claim that none of the discriminatees would have been rehired after May 12, 1960, because the employees retained or newly hired during that period met the Company's employment criteria, and the discriminatees did not. The examiner, after noting that the evaluations were not based on any written records, concluded from his analysis that the Company's testimony was "fraught with inconsistencies, internal contradictions, exaggerations and implausibilities". He noted that the Company's sole proprietor, Jack Buncher, had testified that there was nothing seriously wrong with the discriminatees' work, and that he would rehire them if needed. He also found that the Company trained employees to perform tasks which the discriminatees could have been trained to perform. In the light of these and other findings, the trial examiner decided that "the charted information was contrived for the purpose of denying backpay to the discriminatees". He therefore rejected the Company's evidence and recommended that the Board adopt the specifications of the General Counsel.

The Board affirmed the examiner's decision. It pointed out that since the Company's "system" had been discredited it was impossible to determine precisely the amount of backpay in any particular case. It held further that to prevent the General Counsel from estimating the pay each discriminatee would have earned because he was unable to establish with certainty that the employees would have been retained would permit the Company to profit from its own wrong. In consequence the Board found that the premises underlying the General Counsel's prima facie case were reasonable and directed the petitioner to comply with the examiner's recommended order. The proceedings before this court followed.

■ Where it has been established, as here, that an employer has discharged employees discriminatorily, but it asserts in mitigation of backpay claims that such employees would have been laid off even absent such discrimination, it has the burden of proving that fact. N. L. R. B. v. Mastro Plastics Corp., 354 F.2d 170, 175–176 (2nd Cir. 1965), cert. den. 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1965). The examiner offered and the Company took full advantage of the opportunity to meet its burden of producing credible evidence from which a remedial formula might be adopted by the Examiner to approximate the result in the absence of discrimination.

■ A chart, prepared after the fact, was introduced into evidence by the Company. It listed numerous non-discriminatory factors and evaluations concerning the employees during the pertinent period, which tended to support the Company's contention that none of the discharged employees would have been rehired. It also offered elaborate supporting testimony. The examiner found, and his findings have substantial record support when the record is considered as a whole, that the Company's evidence contained so many pervasive infirmities that it was not a reliable basis for deciding the backpay issue. The matter being in this posture, was it arbitrary or unreasonable for the examiner to apply the seniority rule suggested by General Counsel? Admittedly, this Company did not have a formal seniority system. But the record in this case does indicate that

length of service was a factor in its employment "policy." Furthermore, the seniority standard represents "normal industrial practice generally." NLRB v. Kartarik, Inc., 227 F.2d 190 (8th Cir. 1955). Thus, in our view, considering the credible evidence in this record, the seniority standard was a rationally permissible device for the examiner to employ in fashioning the remedy.

■ But the Company argues that there is no substantial evidence to support the use of the seniority formula and, further, that its use was in contradiction to other and previous findings of the Board which are said to have substantial evidentiary support. In our view, these contentions fail to give appropriate recognition to the manner in which these proceedings unfolded. Certainly the previous findings of the Board showed that the Company did not have a formal seniority system. But it does not follow that the use of such a factor in molding relief is automatically unreasonable where the Company, though having the burden and given the opportunity, failed to supply credible evidence in support of some other method of approximating the situation absent discrimination. Having in mind that the examiner was seeking an approximation, the remedy is not objectionable merely because it may not be consistent with the work histories, etc., of some of the employees involved. The Company had a full and fair opportunity to make its record in this already protracted proceeding. Since the burden here was on the Company, and since it failed to carry that burden, we think the examiner and the Board properly adopted the seniority device as a rational remedy on this record.

■ The Company attacks the examiner's admittedly rough rule that seven consecutive days or less of interruption in employment was not deemed to constitute a break in seniority. The record showed that employees were often discharged for "cause" and rehired without any economic sanctions. The evidentiary history of this rather "personalized" operation justified some rule to cover this problem. We cannot say on this record that the period adopted was unreasonable.

■ Finally, we consider the Company's contention that the Board erred in concluding that the Company was liable for backpay as to all discriminatees up to May 12, 1960, which was the date of the first economic reduction in force subsequent to the last discriminatory layoff.

The Company urges that the first layoff for economic reasons subsequent to the discriminatory one would have occurred during the week of March 10, 1960, because it was clear by that date that the Company was operating the Nine Mile Run facility efficiently with the reduced work force. From this premise, the Company reasons that, had it then carried thirty-five men rather than the twenty-two actually employed (there being thirteen discriminatees), it would have reduced its work force to twenty-two. This contention contains so many doubtful propositions that we cannot say the Board was unreasonable in rejecting it. First, of course, it suggests the Company would have been aware of the economic feasibility of operating the facility with twenty-two men on March 10, 1960. Considering the nature of the Company's operation we do not think that there would have necessarily been such a precise correlation between economic efficiency and the number of employees retained. Another infirmity in the Company's contention is its assumption that had there been a reduction in the work force for purely economic reasons the discriminatees would have been among those discharged. In any event, there is no basis for assuming that the discriminatees would not have been transferred to other operations of the Company. When these factors are considered in conjunction with the admittedly objective evidence of an economic reduction in force on May 12, 1960, we think the Board was justified in using that date as the commencement date for inquiry into possible economic justification for the discharge of the discriminatees. We say

this without passing upon the correctness of the Board's reasoning that the Company's contention here constitutes an attempted relitigation of the unfair labor practice proceeding.

We think that, in these circumstances, the Board did not exceed its power in concluding that the Company did not make a showing entitling it to the relief requested with respect to the period prior to May 12, 1960.

We therefore deny the Company's petition to review and to set aside the Board's order and grant the Board's cross-petition to enforce its order.

VAN DUSEN, Circuit Judge (dissenting).

I respectfully dissent from the majority opinion because this record shows that the determination of back pay, based on the seniority system adopted by the General Counsel, is arbitrary and unreasonable under the circumstances and that the substantial award is punitive, rather than remedial, in nature.[1]

The trial examiners in both the original unfair labor practice case and the present back pay case made detailed findings of the peculiar nature of Buncher's business and his employment practices. Buncher operated out of three locations: Nine Mile Run, Leetsdale, and the "Yard." The business was quite diversified, including scrap reclamation, scrap breaking, construction and leasing of industrial buildings, demolition and salvage of buildings and bridges, steel fabrication, and operation and maintenance of a large river port, including a half-mile long dock with gantry cranes and vessels. Buncher's diversification apparently resulted from efforts to avoid sole dependence on the steel industry's fluctuating needs for scrap retrieved from slag. He needed men who could perform various jobs at the several locations, jobs ranging from the construction of warehouses and docks to the demolition of buildings and the operation of several complicated machines. The lengthy 1960 Intermediate Report in the unfair labor practice proceeding discussed in great detail Buncher's defense that the discharges beginning January 15, 1960, were motivated by economic reasons considered by the employer as early as December 1959 (131 N.L.R.B. at 1456–59). This defense included the argument that discrimination could not be shown from the fact that some men retained had less seniority than those discharged because Buncher used no seniority system. The trial examiner accepted this proposition, but also found that, despite the strong economic defense (131

---

1. In the unfair labor practices action, the Board decided that Buncher had discriminated against 13 employees, 131 N.L.R.B. 1444, 1447 (Appendix A). The Board's order was enforced by this court. N. L. R. B. v. Buncher, 316 F.2d 928 (3rd Cir. 1963). Thereafter, in a Supplemental Decision, the second trial examiner recommended an award of $19,519.47, plus interest, to the 13 discriminatees. His decision was reversed and remanded, whereupon he awarded a total of $99,236.32, plus interest, on the basis of the seniority formula quoted in the majority opinion. That award conformed exactly to the Backpay Specification as to 10 discriminates; in the case of two others, the Specification was reduced by a total of $52.86; the remaining discriminatee's award was $24.24 less than the amount provided in the Specification. The Second Supplemental Decision, as affirmed by the Board, has not yet brought an end to these back pay proceedings because discriminatees Ivy, Rutherford, Loughner and Wytiaz may be entitled to additional back pay.

It is noted that the assumption that work similar to that which the four discriminatees possibly eligible for additional back pay had been doing was available at Nine Mile when Buncher rehired them at Leetsdale, appears unsupported by the record. Wytiaz, for example, immediately prior to the discrimination had just been given "the opportunity to start breaking in on some pieces of equipment" at Nine Mile Run following his initial job as a laborer, which laboring job he was given at Leetsdale. Other discriminatee equipment operators (Robert Vinsick and Ronald Loughner) would all have been senior to Wytiaz, making it appear unlikely that this equipment operator job was available for him at Nine Mile Run in September 1962.

N.L.R.B. at 1456), the discrimination was shown by the "timing of the terminations" (131 N.L.R.B. at 1457) and the fact that all discriminatees were union adherents (131 N.L.R.B. at 1460). In reaching this conclusion, he noted that:

"It is appreciated that in an economic cutback, selection of men equally competent requires fine decisions, particularly in the absence of a seniority agreement or practice, and the Company's business judgment is not to be lightly cast aside and errors in judgment substituted for proof of discrimination. The Company's asserted reasons for its selections, however, cannot be considered apart from the considerable evidence indicating discrimination in selection set forth above." 131 N.L.R.B. at 1460.

The Board, in its decision of June 30, 1961 (131 N.L.R.B. at 1444), approved this finding of lack of a seniority system and of the peculiar nature of Buncher's business,[2] to which this court explicitly referred in enforcing the order, 316 F. 2d at 929. In light of these prior findings and after an examination of the testimony offered by petitioner[3] to support the back pay computation,[4] the use of seniority (in the Board's back pay formula quoted in the majority opinion) appears arbitrary and unreasonable. The unfair labor practice proceeding, with its finding of a violation of § 8(a) (3), proves only that some back pay is owed; if the precise amount cannot be determined, the Board's approximation must still have a rational basis. This basis for the back pay does not become more rational because the second trial examiner rejects, for the first time in his Second Supplemental Decision, some of the employer's evidence as subjective and self-serving, particularly where the first trial examiner did not find the testimony of substantially the same Company witnesses "fraught with inconsistencies, internal

2. "The Board * * * hereby adopts the Trial Examiner's findings, conclusions, and recommendations, * * *" 131 N. L.R.B. 1444.

3. To rebut the petitioner's backpay formula, respondent's extensive chart and supporting testimony showed that the rating of each employee in these categories governed all layoff, hiring or transfer:

"(1) Ability to do the available work, including:

(a) Relative ability to perform the employee's regular job; and

(b) Relative ability to peform other jobs in the same plant; and

(c) Relative ability to perform the same job or other jobs in other plants of the Company.

(2) Rate of Pay.

(3) Productivity.

(4) Application to work.

(5) Attitude toward work and willingness to learn.

(6) Ability to learn new skills.

(7) Limitation on availability.

(8) Experience with the Company.

(9) Experience with other employers.

(10) Relative length of service with the Company. Although the Company has no formal system of seniority, and has not laid off or recalled by strict seniority, relative length of service has been and is one factor considered along with the others."

4. This testimony covered approximately 50 transcript pages (as contrasted with management testimony covering approximately 700) and showed that the seniority-based back pay calculation rested on unsubstantiated assumptions such as seven days of layoff breaking seniority and the date of last hire, as opposed to original hire, being the crucial date. The compliance officer who testified stated that he paid no regard to the type of work available and that the seven-day layoff "rule" was not used consistently but only to establish seniority as of 1/14/60 and not for seniority changes thereafter. In a comprehensive recent article on this subject, this statement appears: "Throughout the history of backpay proceedings under the Act, there has been no dispute that the Board bears the burden of proving the gross amount of back pay due each claimant." Fuchs & Kelleher, "The Back-Pay Remedy of The National Labor Relations Board," 9 Boston College Industrial and Commercial Law Review, 829, 860 (1968).

contradictions, exaggerations and implausibilities." [5]

Not only is there an absence of substantial evidence to support the seniority system used to calculate the back pay, but the sole reliance on such a seniority system (and its "ground rule" that a seven-day layoff would break seniority, but only for purposes of determining seniority up to January 14, 1960) is in contradiction to other and previous findings of two trial examiners concerning Buncher's business operation which were based upon substantial evidence in the record as a whole.[6]

No reason has been shown to justify rejection of the findings of the trial examiner in his Intermediate Report, 131 N.L.R.B. 1448, affirmed by the Board, 131 N.L.R.B. 1444, and by this court, N. L. R. B. v. Buncher, 316 F.2d 928 (3rd Cir. 1963); cf. N. L. R. B. v. United States Air Con. Corp., 336 F.2d 275 (6th Cir. 1964); N. L. R. B. v. Biscayne Television Corporation, 337 F.2d 267 (5th Cir. 1964). On the basis of this first trial examiner's findings that various modifications and improvements were made to Buncher's plant during the 1959 steel strike (131 N.L.R.B. at 1457); that Buncher had decided there were too many employees on the payroll and determined to lay some off (131 N.L.R.B. at 1457); and that only 7 or 8 acres of the original 200-acre slag dump at Nine Mile Run remained to be worked, and less heavy equipment was, therefore, needed (131 N.L.R.B. at 1457), he concluded that Buncher had an economic justification for reducing the staff (131 N.L.R.B. at 1460–61). The only questions in the back pay proceeding then were which employees were to be laid off, at what time, and by what standards (see 131 N.L.R.B. at 1457).

At best, the record made at the back pay hearings is incomplete and the case deserves a remand in order to benefit from further testimony. An example of the incompleteness of the testimony to support even the specific findings in the Second Supplemental Decision is evidenced by the finding that "on and after May 12, 1960, Respondent had jobs available at Nine Mile for * * * two shovel operators * * *." (731a–32a). The only testimony shows that there were two shovels being used on March 10, 1960, but that when the back pay testimony was given in 1965, Mr. Green, the General Manager of Buncher Company, made clear that only one shovel was then, and had been, in operation at that location. Also, he testified that only one shovel was being operated there following May 12, 1960. It is unclear from the testimony whether Buncher ever operated two shovels at the same time at Nine Mile Run after May 12, 1960, but the record makes this seem most unlikely. That fact would be significant for two reasons. First, there were five discriminatees whose job it was to operate the shovel. It is, therefore, necessary to determine which two of the five, if any, would have been retained, absent the discrimination. When the operation was reduced to one shovel, the back pay for one of the operators should be terminated on that date. Sec-

---

5. Although the first trial examiner did not accept certain denials of these witnesses (see 131 N.L.R.B. 1453–54), he did not dismiss their entire testimony with eight such sweeping words first used by the second trial examiner after his less drastic approach to the back pay problem had been reversed by the Board.

6. Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It is noted, for instance, in the trial examiner's first supplemental decision, fn. 17, he observed that:

"The General Counsel introduced into evidence General Counsel's Exhibit No. 3 in an attempt to demonstrate that, during a reduction in force in 1957, Respondent 'basically' utilized seniority in affecting the reduction at the Nine Mile Run location. This attempt proved abortive. The exhibit shows that 34 employees were employed on the date of the layoff, and 16 of them were separated. Nine of these employees, including a discriminatee, were laid off out of context with their seniority."

ond, three of the discriminatee shovel operators (Greene and the Cindricks) were found to be entitled to no back pay after January 12, 1962. Assuming two of these three were entitled to back pay originally, the back pay for one of these two should have been cut off prior to January 12, 1962, provided, as the record indicates, operation of one of the shovels did not resume between May 12 and that date. No reason has been shown why the trial examiner, who made back pay awards based on the operation of two shovels, could not determine when single shovel operations began, which two of the five discriminatees, if any, would have operated the shovels but for the discrimination, and, when only one shovel was operated, which discriminatee, if any, would have operated the shovel absent the discrimination.[7]

Also, the findings and comments in the Second Supplemental Decision contain references, favorable to General Counsel's Backpay Specifications, concerning certain discriminatees but fail to refer to further explanatory or additional testimony of the same witness which points to the opposite conclusion. In the case of John Cindrick, for example, the trial examiner relies on re-spondent's admission that Cindrick was an excellent shovel operator, but fails to consider that the same witness testified that Cindrick refused to go to Leetsdale, "wouldn't get his hands dirty with grease," and would not do any other work.[7] I have been unable to find any support in the record for statements in the Second Supplemental Decision such as that Gerald Hinger, a retained employee, had "an admitted lack of proficiency in the jobs in which the Cindricks and Greene concededly excelled * * *".[8]

This language of the Supreme Court of the United States appears to apply to the situation presented by this record:

"* * * [T]he Board may [not] apply a remedy it has worked out on the basis of its experience, without regard to circumstances which may make its application to a particular situation oppressive and therefore not calculated to effectuate a policy of the Act." National Labor Relations Board v. Seven-Up Co., 344 U.S. 344, 349, 73 S. Ct. 287, 290, 97 L.Ed. 377 (1953). See, also, N. L. R. B. v. Ozark Hardwood Company, 282 F.2d 1, 7–8 (8th Cir. 1960).[9]

---

7. If it were determined that John Cindrick would not have been retained as a shovel operator when the operation was reduced to one shovel, his back pay must terminate on that date, since he was exclusively a shovel operator and he refused to work anywhere but at Nine Mile. Conceivably, only one shovel was used prior to January 12, 1962; if that is so, there should be a corresponding reduction in the back pay award to him.

8. Herbert Green testified that Hinger was "a good man" operating the shovel.

9. In Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 11–12, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940), this language was used:
   "This language should be construed in harmony with the spirit and remedial purposes of the Act. We do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures, and thus to prescribe penalties or fines which the Board may think would effectuate the policies of the Act. We have said that 'this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order.' We have said that the power to command affirmative action is remedial, not punitive. Consolidated Edison Co. [of N.Y.] v. National Labor Relations Board, 305 U.S. 197, 235, 236 [59 S.Ct. 206, 219, 83 L.Ed. 126]. See, also, National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 267, 268 [58 S.Ct. 571, 574, 575, 82 L.Ed. 831]. We adhere to that construction."
   Again, in the Seven-Up case, supra, the court said 344 U.S. at page 346, 73 S.Ct. at page 288:
   "Section 10(c) of the Taft-Hartley Act, under which the Board made its award, derives unchanged, so far as is

The arbitrary imposition of this seniority system under these peculiar facts fails to take job assignments and employee capabilities into account. There are five discriminatee shovel operators, for example, yet there were, at most, only two shovels at Nine Mile Run. The seniority system adopted in the Backpay Specification would cause arbitrary assignment of discriminatees to jobs for which they are unqualified, and would require that certain retained employees be dismissed to make room for discriminatees who are incapable of performing the tasks incident to such jobs and would not have been assigned such work but for the fictional solution of seniority.

The propriety of the determination that petitioner had admitted liability for back pay up to May 12, 1960, seems doubtful if based, as it appears, solely on the ground that Buncher sought to relitigate the unfair labor practice proceeding.[10] However, a new Backpay Specification might make this issue moot.[11]

---

now relevant, from the National Labor Relations (Wagner) Act. 49 Stat. 449, 454. It charges the Board with the task of devising remedies to effectuate the policies of the Act. Of course the remedies must be functions of the purposes to be accomplished, and in making back pay awards, the Board operates under a further limitation. It must have regard for considerations governing the mitigation of damages; it must, that is, heed 'the importance of taking fair account, in a civilized legal system, of every socially desirable factor in the final judgment.' "

10. The present case does not, for example, seem to fit the situation in N. L. R. B. v. United States Air Con. Corp., 336 F. 2d 275 (6th Cir. 1964), and N. L. R. B. v. Biscayne Television Corporation, 337 F.2d 267 (5th Cir. 1964). The 13 illegal discharges in this case occurred between January 15 and March 4, 1960, and it is not relitigation to contend, for instance, that employees illegally discharged in January might have been legally discharged subsequent to that date but prior to March 4, or prior to May 12.

It is noted that the General Counsel's Exhibit #14 showed a sharp drop in employment at the Nine Mile Run plant from a 1/7/60 high of 34 to an 8/4/60 low of 15, with a rather consistent number of 22 from 2/25 to 5/12 before the total became 18 or under until December 1960 (with one exception). Similarly, Exhibit #11 showed a drop of the total at all three Buncher operations from a 1/7/60 high of 73 to a 5/10/61 low of 41, with a frequent total of 48 during the period after 5/5/60.

11. At least some of the allegedly important factors in Buncher's evaluation, of which Buncher employees' jobs would have been terminated due to economic cutbacks and the dates of such terminations, are capable of objective proof by means other than testimony and cross-examination of members of the employer's management. The number of jobs employees have performed, their willingness to transfer to other plants, rates of pay, limitations on their availability, experience with Buncher, and experience with other employers are examples of criteria suggested by Buncher, which may be obtained by interviewing employees, including the discriminatees, and by using documentary and other evidence. Such factors (and possibly others), if challenged, thus appear capable of "objective" proof. The Regional Director can secure such information, affidavits, etc., and can augment calculations based on relative length of service with Buncher in order to make the back pay calculation a more rational approximation in light of the demonstrated, peculiar characteristics of Buncher's business operation. Other Board back pay formulas such as the "comparable employee" formula, East Texas Steel Castings Company, Inc., 116 N.L.R.B. 1336, 1337 (1956), enforced 255 F.2d 284 (5th Cir. 1958), or the "representative employee earnings test," N.L.R.B. v. Charley Toppino and Sons, Inc., 358 F. 2d 94, at 97 (5th Cir. 1966), may be adaptable to the facts in this case, particularly in some combination with a seniority system that conforms more to Buncher's practice. Moreover, such a Backpay Specification may be capable of more meaningful examination before the trial examiner so that he would not be faced with the dilemma, which he apparently thought confronted him in this case, of approving all or none of the Regional Director's back pay approximations as presented by the General Counsel.

For the foregoing reasons, I would grant the Petition to Review, set aside the Board's order, remand the case to the Board for proceedings in the light of this opinion, and deny the Board's cross-petition to enforce its order.

Kalodner and Aldisert, Circuit Judges, join in this dissent.