

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-16-2001

# Atlantic Limousine v. NLRB

Precedential or Non-Precedential:

Docket 99-5609

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Atlantic Limousine v. NLRB" (2001). *2001 Decisions.* Paper 50.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/50

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 16, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-5609 and 99-5725

ATLANTIC LIMOUSINE, INC.,
      Petitioner No. 99-5609

v.

NATIONAL LABOR RELATIONS BOARD,
      Respondent

NATIONAL LABOR RELATIONS BOARD,
      Petitioner No. 99-5725

v.

ATLANTIC LIMOUSINE, INC.,
      Respondent

On Petition for Review of an Order of the
National Labor Relations Board
and
Cross-Application for Enforcement
(NLRB Docket Nos. 4-CA-21505, 4-CA-21552,
4-CA-21697, and 4-CA-21740)

Argued December 1, 2000

Before: BECKER, Chief Judge, RENDELL,
and MAGILL,* Circuit Judges

(Opinion Filed: March 16, 2001)
_____

* Honorable Frank J. Magill, Senior Judge of the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

Angelo J. Genova, Esq. [ARGUED]
Brian O. Lipman, Esq.
GENOVA, BURNS & VERNOIA
354 Eisenhower Parkway
Plaza II, Suite 2575
Livingston, NJ 07039
 Counsel for Atlantic Limousine

Jeffrey Horowitz, Esq. [ARGUED]
Aileen A. Armstrong, Esq.
Frederick C. Havard, Esq.
Margaret A. Gaines, Esq.
Fred B. Jacob, Esq.
National Labor Relations Board
1099 14th Street N.W.
Washington, DC 20570-0001
 Counsel for NLRB

OPINION OF THE COURT

RENDELL, Circuit Judge.

Atlantic Limousine, a limousine service providing services primarily to hotels and casinos in Atlantic City, New Jersey, has petitioned this court for review of the Or der of the National Labor Relations Board awarding backpay in the amount of $22,507.74 plus interest to V ictor Jenkins, and $17,296.73 plus interest to Henry Purcell, both of whom were limousine drivers for Atlantic. The Boar d has cross-applied for enforcement of the same order .

Specifically, Atlantic challenges the amount of tips the Board determined the two had earned, arguing that: (1) federal tax policy requires that the amount of tips Purcell and Jenkins declared on their income tax r eturns for those periods be dispositive on the issue of their past income; and (2) there was a lack of substantial evidence in support of the Board's backpay award. In addition, Atlantic contends that Jenkins failed to mitigate his damages because he was unavailable for work during the seven months between his termination and his reinstatement. Because we find both that the Board's reliance on the evidence adduced was

2

proper, and that there was substantial evidence to support the Board's findings regarding both backpay and mitigation, we will deny the petition for review and enforce the order of the Board.

## I. Procedural History

On March 4, 1995, the Board found that Atlantic had engaged in unfair labor practices in violation of 29 U.S.C. 158(a)(3) and (4) of the National Labor Relations Act ("Act") by discharging four and suspending one of its employees for their union activities.[1] Once the Board finds that an employer has committed an unfair labor practice, it has broad discretion under the Act to order the wrongdoer "to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies of [the Act]." 29 U.S.C. S 160(c). The purpose of the backpay remedy is to "mak[e] the employees whole for losses suffered on account of an unfair labor practice," Nathanson v. NLRB, 344 U.S. 25, 27 (1953), by restoring "the situation, as nearly as possible, to that which would have [been] obtained but for the illegal discrimination." Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194 (1941).

On May 28, 1997, the Board filed a compliance specification outlining the amount of backpay that should be paid to the aggrieved employees under the Board's March 4, 1995 remedial order. Atlantic challenged the compliance specification, and a hearing was held before an Administrative Law Judge ("ALJ"). The ALJ upheld the backpay award, and the Board affirmed its decision. We now review the Board's order.

## II. Background

The standard formula the Board employs in arriving at a compliance specification is based on the earnings of the claimant in a representative period prior to the backpay

_____

1. Although the proceeding before the Board involved five claimants, after the Board's decision, the parties entered into negotiations and three of those employees settled. This appeal, therefore, only addresses the backpay awards for Purcell and Jenkins.

3

period. The Board then applies the averages of those earnings to the backpay period. Atlantic does not challenge the formula used. Rather, it contends that the average weekly tip earnings used in the formula were incorrect because they exceeded the amounts reported on the employees' tax returns and were unsupported by the evidence.

Atlantic's drivers can be tipped in a variety of ways. Certain corporate and business clients have a contractual relationship with Atlantic, and are billed for services with charges that include a preset gratuity for the driver, which is distributed in the next paycheck. These tips ar e referred to as "tips on the bill." The drivers can also receive tips in cash or they can be added to a payment by cr edit card. Because tips on the bill and credit car d tips are reflected in amounts transmitted directly to Atlantic, the only tip amounts disputed on appeal are the claimants' cash tips, since the drivers receive them directly fr om customers without receipts showing the amount given.

Atlantic requires its drivers to submit weekly time sheets indicating the number of hours they worked and the specific runs they made. These sheets also have a space at the bottom for the drivers to record the amount of cash tips they received, though the General Manager for Atlantic, Leon Geiger, testified that most drivers do not provide any information regarding their cash tips on their time sheets. Atlantic processes the timesheets and generates weekly tip declarations reflecting credit car d tips, tips on the bill, and the cash tips reported on the time sheets. These tip declaration reports are then distributed to the drivers for their review and signature. The employees are instructed not to sign a tip declaration report if the tip amount indicated is incorrect.

Jenkins and Purcell claimed that they ear ned more in tips than reported in payroll and tax documents. Jenkins testified that he earned approximately $450 per week in tips, while Purcell claimed to have ear ned anywhere from $300 to $480 per week. Both admitted they had not accurately reported these earnings to the Internal Revenue Service ("IRS"). Jenkins had reported annual tip income to the IRS that reflected an average of $158 per week during

4

this time, and Purcell, $115. Jenkins also testified that he would submit only the carbon copy of the time sheet to Atlantic, omitting his cash tips, but that he would record his cash tips on the original copy in a column listed as "Added Tips." He submitted the original copy of the time sheet for the last week he had worked for Atlantic in order to demonstrate this practice. This original copy r eflected cash tip earnings of $430 for that week. That document was the only one submitted by Jenkins in support of his claim of higher tip levels. Purcell did not pr ovide any documentation.

Jenkins also testified regarding his search for interim employment. He indicated that he searched for employment during the seven months he was unemployed by applying to two limousine companies approximately two weeks after he was terminated, answering newspaper ads for jobs at three casinos, and sending out many resumes. During those seven months, he was caring for his mother , who was ill. He stated that because his mother was sick and he was her caretaker, he was only available for work in the evening hours, though he explained that his time restriction did not prevent him from being able to work full-time. He also emphasized that he searched for employment during the entire period in question. He posited that the reason he could not find another limousine job right away was because he was "blackballed."

Seeking to counter the testimony of Jenkins and Pur cell, Atlantic provided payroll recor ds for 1992 and 1993 reflecting credit card tips, tips on the bill, and any cash tips declared by employees to Atlantic. Atlantic ur ged that these records, along with the tax retur ns filed by Jenkins and Purcell, should form the basis for deter mining its backpay liability.

On February 26, 1998, the ALJ issued its Supplemental Decision awarding Jenkins and Purcell $360 and $325 per week in backpay, respectively, which wer e the amounts set forth in the Board's compliance specification. First, the ALJ ruled that claimants may assert tip income that had not been reported in their tax returns. While the ALJ recognized that both claimants had failed to r eport all of their tip earnings to the IRS, he found that an admission of

5

underreporting tips to the IRS does not pr eclude such tips from being included in a backpay award. The ALJ also determined that "both the employees and the Respondent had offsetting interest [sic] in under reporting actual income." ALJ Dec. at 4.

The ALJ stated its conclusion: "While the evidence is less than overwhelming, under these circumstances, I am not persuaded that the compliance figures for weekly tips of $360 for Jenkins and $325 for Purcell ar e unreasonable or inaccurate." Id. The ALJ further noted that "[t]he reported tips, relied upon by [Atlantic], clearly are not an accurate reflection of the actual tip income r eceived." Id. The ALJ also found the testimony of Jenkins and Purcell to be "believable." Id. Finally, the ALJ concluded that there was "a sound and reasonable basis for [awar ding] the figures set forth in the compliance specification," and that Atlantic had not offered convincing evidence that Jenkins and Purcell had earned less. Id.

The ALJ next turned to the issue of the mitigation of damages, finding that Jenkins testified cr edibly that he began to search for work immediately after his termination. The ALJ found that despite the fact that Jenkins had no interim earnings, this lack of success did not indicate a "willful failure or an unreasonable search for employment." Id. In addition, the ALJ rejected Atlantic's contention that Jenkins was unavailable for work due to his need to care for his mother.

On April 30, 1999, the Board issued its Supplemental Decision and Order affirming the ALJ's conclusion that "the gross backpay computations in the backpay specifications are the most accurate possible estimates of backpay and that [Atlantic] has failed to establish any r easonable alternative basis for a diminution of damages." Id. The Board agreed that "Victor Jenkins' lack of interim earnings for the backpay period of May 31, 1993, through January 17, 1994, was not indicative of an unreasonable search for employment related to his care for his mother . . . . " Supp. Dec. at 1. It also held that the ALJ's analysis of the issue of whether or not to consider evidence of underr eported tips was in accord with Board precedent, and noted that the IRS would receive a copy of its decision. Id.  at 2. One member

of the three member panel dissented because he would not have allowed the discriminatees to claim income not reported to the IRS, and because he believed that Jenkins did not make an adequate search for employment during the time period in question.

III. Discussion

We have appellate jurisdiction pursuant to 29 U.S.C. S 160 (e) and (f). The Board's findings of fact in a backpay proceeding will be upheld unless the recor d, considered as a whole, shows no substantial evidence to support those findings. 88 Transit Lines, Inc. v. NLRB , 55 F.3d 823, 825 (3d Cir. 1995). "While we do not substitute our judgment for that of the Board, we may modify an or der to ensure that it effectuates the policies of the Act." Tubari Ltd., Inc. v. NLRB, 959 F.2d 451, 453 (3d Cir . 1992). With respect to legal questions, we exercise plenary review, although we give due deference to the Board's expertise in labor matters. 88 Transit, 55 F.3d at 825.

A. Backpay Determination

Atlantic presented the Board with the income tax returns of Jenkins and Purcell, and urged that itfind those records to be conclusive as to the amount of tips ear ned by each of them, because to not do so would be to ignor e federal tax policy. The Board rejected this reasoning, and on appeal, Atlantic argues that this decision is err oneous. To support its argument, Atlantic relies on two Supr eme Court cases, our precedent, and its view of the policy implications of the Board's ruling.2

_____

2. By asserting that the discriminatees' testimony should have been rejected because their testimony was inconsistent with their sworn tax returns, Atlantic may also be claiming, but has never explicitly urged, that the discriminatees should be "estopped" from asserting higher income, having earlier misreported their true income. While a policy of judicial estoppel has evolved that can apply in the event a litigant seeks to assert a position inconsistent with one made in connection with a previous judicial proceeding, e.g., In re Chambers Dev. Co., 148 F.3d 214, 229 (3d Cir. 1998), we know of no basis for crafting a theory of estoppel based upon sworn statements in a tax return and will not explore such a theory sua sponte.

First, Atlantic points to Southern Steamship Co. v. NLRB, 316 U.S. 31 (1942). There, employees engaged in a strike in response to the shipowner's unfair labor practices, and the shipowner terminated five of the strikers. Id. at 34-35. The Board ordered the shipowner to r einstate the five men with backpay. Id. at 36. The Supreme Court, however, determined that under maritime law, the type of striking conduct in which they engaged was illegal,3 and it reversed the order of reinstatement. Id. at 40, 48.

The Supreme Court expressed the need to limit the Board's discretion in enforcing the policies of the Act when the Board's remedial action contravened important Congressional policy. Id. at 46. In r eaching its conclusion that the claimants' violation of the maritime laws precluded the relief they sought under the Act, the Court made the following observation, which Atlantic argues supports its position:

> It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task.

Id. at 47.

Essentially, the issue before the Supreme Court was whether the labor policy prohibiting an employer from firing an employee for striking in response to an unfair labor

_____

3. The Court stated:

> It may hardly be disputed that each of the strikers resisted the captain and other officers in the free and lawful exercise of their authority and command, within the meaning of S 293, or that they combined and conspired to that end, within the meaning of S 292. Deliberately and persistently they defied dir ect commands to perform their duties in making r eady for the departure from port.

Id. at 40.

8

practice can apply, let alone prevail, when the strike is illegal under a competing federal scheme. In the case before us, by contrast, the issue does not involve a competing policy that runs counter to an award of backpay. Unlike in Southern Steamship, the policies sought to be advanced here are not diametrically opposed to one another. In fact, the policies, to the extent they do compete, can be accommodated, and in fact have been accommodated her e. The Board's basing its finding on the evidence before it, consistent with its procedure for fixing and awarding backpay, while at the same time notifying the IRS of its decision, recognizes the existence and equal importance of both policies -- enforcing our nation's tax laws and making the discriminatees' whole. If the Board had chosen to award the amount stated on the tax returns for the sole reason that the discriminatees would have to "reap what they had sown," it would have ignored the remedial underpinnings of the law, and rewarded Atlantic, the of fending party.

Moreover, we submit that while federal tax policy discourages underreporting of income, and favors punishing those who do, federal tax policy would appear to have no interest in limiting a backpay awar d. In fact, it could be said that it has the opposite inter est because once Jenkins and Purcell receive an awar d (that is not limited by reference to reported income), they will have to pay tax on what they receive, paying the federal gover nment more than if the award had been limited to their r eported income.4

Here, despite Atlantic's contentions, we conclude that no federal policy is relegated to a lesser status. The IRS will have the information necessary to prosecute the discriminatees if it so chooses, and will reap tax revenue. And Atlantic will have to "make whole" two employees

_____

4. Backpay awards for violations of the Act would appear to be the type of non-tort recovery that is taxable. See Commissioner of Internal Revenue v. Schleier, 515 U.S. 323, 337 (1995) (holding that settlement for backpay in age discrimination case was not excludable from taxpayer's reported gross income because"[r]ecovery for back wages does not satisfy the critical requirement [of the IRS tax code] of being on account of any personal injury," nor is it "based upon tort or tort type rights.")

9

against whom it wrongly discriminated, fulfilling the purpose of the Act.

Atlantic also relies on Sure-T an, Inc. v. NLRB, 467 U.S. 883, 886 (1984), but we do not find this decision particularly relevant to the instant situation. There, the Board had determined that the employer committed an unfair labor practice by requesting that the Immigration and Naturalization Service investigate certain employees who were involved in a union campaign. Id. at 888. Because some of these employees were undocumented aliens, they fled the country to avoid deportation. Id. at 887. The Board awarded backpay, subject to the employees' legal availability to work. Id. at 889.

On appeal, the Court of Appeals for the Seventh Cir cuit modified the backpay award by ordering that the aggrieved employees be guaranteed a minimum of six months' backpay. Id. at 890. The court reasoned that because some of the employees may not have been lawfully available for employment, without the backpay minimum, they would not receive any backpay at all. Id. The Supreme Court reversed the backpay modification, stating:"The probable unavailability of the Act's more effective remedies in light of the practical workings of the immigration laws, however, simply cannot justify the judicial arrogation of remedial authority not fairly encompassed within the Act." Id. at 904. The key to the Court's reversal of the modification was the Court of Appeals' imposition of a minimum awar d "without regard to the employees' actual economic losses or legal availability for work . . . . plainly exceed[ing] its limited authority under the Act." Id. at 904-05. And, while the Board in the instant case surely shar ed the same concern as the court of appeals in Sure-T an, that is, providing a financial disincentive to the employer against r epetition of similar discrimination, id. at 904, her e, unlike in Sure-Tan, the award of backpay does reflect the discriminatees' actual loss, consistent with the remedial scheme.

Atlantic also maintains that the Board's decision is contrary to our precedent. We do not agr ee. We have previously upheld an award of backpay when it was based on evidence of income in an amount differ ent from that declared by the claimant to the IRS. In NLRB v. Louton, Inc.,

10

822 F.2d 412, 414 (3d Cir. 1987), we upheld the Board's backpay award where the record showed substantial evidence to support the tip income awarded.[5] In doing so, we rejected the employer's argument that the tip income evidence was "of no value" since it differed from the amount the discriminatees had declared to the IRS. Id.

Moreover, while we note Atlantic's argument that awarding backpay based on unreported tips rewards the discriminatees for their dishonesty to the IRS, Atlantic fails to recognize that we would be rewarding the employers' tax dishonesty if we were to disregard evidence of the employees' actual, more substantial reportable income. That is, if we rely on reported income that concededly did not accurately reflect the employee's earnings, we would actually be rewarding employers who, as noted by the ALJ,[6] have benefitted from paying a lesser amount of employment-related taxes as a result of the underreporting. This benefit is in addition to the benefit that Atlantic would reap, in contravention of backpay policy, by having to pay aggrieved employees less in backpay than they actually would have earned.

Lastly, Atlantic contends that if we reject its proposed rule that we should disregard evidence that differs from an employee's tax returns, we would be guaranteeing that all discriminatees seeking backpay will lie about their earnings. However, Atlantic ignores the fact that this deception will probably be quite costly in other ways. By testifying that they had underreported their income to the IRS, Purcell and Jenkins subjected themselves to prosecution for tax evasion. Therefore, any incentive that they might have to lie to inflate their income is countered

_____

5. We acknowledge that, as we discuss below, the discriminatees provided more documentary support in Louton than in the instant case, and we note that it is unclear whether the employer's argument in that case was based on policy considerations. However, the distinction is immaterial, where, as here, we have nonetheless determined that the discriminatees' credible testimony (and supporting document) are sufficient to meet the "substantial evidence" standard.

6. "[T]he lower the reported earnings [of an employee are], the lower the employer's payroll tax liability [is]." ALJ Dec. at 4.

11

by the fear, and very real possibility, of criminal charges. We noted this in Louton, when we found that the employees' claims were actually strengthened by the fact that they had maintained the veracity of their tip claims in the face of potential prosecution for tax evasion or perjury. 822 F.2d at 414.

Accordingly, we reject Atlantic's contention that the evidence regarding the discriminatees' unr eported tips in the Board's backpay award should be disr egarded because it undermines federal tax policy.

B. Substantial Evidence Determination

As noted above, the Board's findings of fact in a backpay proceeding will be upheld unless the recor d, considered as a whole, shows no substantial evidence to support those findings. 88 Transit, 55 F.3d at 825. Substantial evidence has been defined as evidence that a reasonable mind would accept as adequate to support an agency's conclusion. Broome v. U.S. Dept. of Labor, 870 F .2d 95, 102 (3d Cir. 1989). We will not disturb a backpay or der "unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to ef fectuate the policies of the Act." 88 Transit, 55 F.3d at 825.

In Louton, we held that "the recor d, when considered as a whole, shows substantial evidence to support the Board's findings." 822 F.2d at 414. In that case, the Board's decision was based on documented tip evidence of the discriminatees, the ALJ's determination that the discriminatees were credible, the fact that the discriminatees' testimony was bolstered by their facing prosecution for perjury or tax evasion due to their admission that they had underreported their tips to the IRS, and the employer's failure to submit gr oss receipts in order to demonstrate that the tips being claimed were reasonable. Id.

In the instant case, the discriminatees' claims wer e proven, for the most part, through their own testimony, and accordingly, the outcome was affected by their credibility. In Louton, we stressed the importance of the ALJ's reliance on the demeanor of the discriminatees during their

12

testimony regarding their tip income, noting that where credibility determinations are based on the ALJ's assessment of demeanor, those determinations are entitled to great deference as long as relevant factors are considered and resolutions explained. Id.; see also NLRB v. Lee Hotel Corp., 13 F.3d 1347, 1351 (9th Cir . 1994) (enforcing Board's order basing backpay award on amount of tip income which differed from amount r eported on income tax returns where ALJ found employees' testimony credible based on both corroborative evidence and potential ramifications of the discriminatees' testimony). In the instant case, while the documentary evidence was not comparable to the submissions in Louton, the ALJ credited the discriminatees' testimony, harkening back to our stated view in Louton regarding the importance of credibility and the deference we should afford the ALJ's determinations in the absence of any evidence indicating otherwise. 822 F.2d at 414; Lee Hotel, 13 F.3d at 1351 ("The ALJ's credibility determinations should not be reversed unless inherently incredible or patently unreasonable").

In addition, Jenkins presented the original copy of the time sheet he had submitted for the week of May 19, 1993, which indicated he had made $430 in cash tips that week. He acknowledged that the carbon copy of that time sheet, which was submitted to Atlantic, did not reflect any cash tips. Thus, he asserted that this document corr oborates his testimony that he would leave the space for cash tips blank on the copy of the time sheet he gave to his employer, while keeping another for himself where he recor ded his tips. This document is the only written proof of the unreported tips earned. As we have noted, the ALJ concluded that while the evidence was not "overwhelming," the Board had "established a sound and reasonable basis for the figures set forth in the compliance specification . . . ." and he was not persuaded that the figures were"unreasonable or inaccurate." ALJ Dec. at 4.

In a backpay proceeding, once the Board's General Counsel demonstrates the gross amount of backpay that the claimant is due, the burden shifts to the employer to demonstrate that no backpay is due or that the amount due had been improperly determined. 88 Transit Lines, 55

13

F.3d at 827; Angle v. NLRB, 683 F.2d 1296, 1301 (10th Cir. 1982); NLRB v. United Bhd. of Carpenters & Joiners of Am., Local 1913, 531 F.2d 424, 426 (9th Cir. 1976). If there is substantial evidence supporting the Board's conclusion that Atlantic has not met its burden "to establish facts which would negative the existence of liability . . . . or which would mitigate that liability," we must uphold the Board's conclusion. 88 Transit Lines, 55 F.3d at 827; see also Angle, 683 F.2d at 1302 (granting the Board's order for enforcement where employer did not present necessary "sufficient credible evidence" to support assertions that Board's calculations were wrong); Carpenters, 531 F.2d at 426 (upholding Board's conclusion where employer had "not met its burden of negativing the General Counsel's findings").

Atlantic submitted evidence that it contends was proof of the discriminatees' income. It relied on the tax return evidence, which, as we have mentioned, could be said to cut both ways. Even though the tax returns contradict the discriminatees' claims, the fact that their sworn testimony that they underreported their income exposed them to tax evasion and perjury charges actually bolsters their credibility. Louton, 822 F.2d at 414. Aside from its assertion that disregarding tax evidence undermines an important congressional policy, which we have rejected, Atlantic presented no basis for concluding that the employees' tax returns, rather than their testimony, reflected the actual amount of their income. Atlantic also submitted the weekly signed tip declarations, urging that these forms were the employees' "oaths" that they had declared all the cash tips they had earned, and that they should have to stand by what they declared. However, the evidence in this regard was conflicting. Jenkins testified that David Geiger, one of Atlantic's owners, had actually instructed him not to enter his cash tips on the carbon copy of the time sheet that he submitted. Jenkins stated that the time sheet was even returned to him once when he mistakenly wrote his cash tips on that form. Further, Leon Geiger testified, and Atlantic does not dispute, that most workers did not write in any cash tips on their time sheets. It seems obvious that Atlantic was aware that most employees were earning, but simply not declaring, their cash tips. Hence, we do not take

14

issue with the ALJ's finding that Atlantic's position that the time sheets actually reflected total tips was nothing more than a "fiction." ALJ Dec. at 3.

Atlantic also attacks the quality of the evidence that Jenkins and Purcell have produced to support their claims of tips earned, contending that they lack corr oboration. However, we do not regard that as dispositive. Rather, we deem it fairly common for employees not to keep r ecords of the tips they earn. Further, as a practical matter, it would probably be difficult for Purcell and Jenkins to bring forward witnesses to corroborate their actual tip income and earnings, given the fact that if their co-workers testified that they too had declared lower cash tips than what they actually had earned and reported, they would be subjecting themselves to prosecution for tax fraud. And, the issue before us under the substantial evidence standard is whether a reasonable mind would accept the evidence as adequate, not whether it could have been bolster ed through corroboration or additional testimony.

Atlantic complains that there really is no defense an employer can present to overcome the discriminatees' assertions, but we disagree. Atlantic could have leveled further attacks on the employees' credibility, kept the type of records that would have rebutted these types of claims, or produced witnesses to attack the claimants' stories. Atlantic did not submit other evidence which would tend to disprove the discriminatees' claims. As in Louton, where we noted the company's failure to produce gr oss receipts which would have allowed the ALJ to ascertain whether the tips asserted by the discriminatees were reasonable, 822 F.2d at 414, here, Atlantic did not introduce r eceipts of total sales from which we could glean how much the drivers should have earned in tips. Atlantic's urging that the discriminatees should be foreclosed based on their tax returns and purported tip declarations does not convince us that the Board's decision lacks substantial evidentiary support.

Atlantic's attacks on the employees' proof, and its excuses for lack of evidence, cannot distract us fr om the fact that the burden of proof is on the employer, as the wrongdoer, to establish facts to dispute the claim of the

15

aggrieved employee. NLRB v. Brown & Root, Inc., 311 F.2d 447, 454 (8th Cir. 1963). Once Jenkins and Purcell had presented their case, the onus for the pr oduction of witnesses was not on the claimant, but rather , on Atlantic. In Hacienda Hotel and Casino v. Willow Bowe , 279 N.L.R.B. 601, 602 (1986), the ALJ had the benefit of the testimony of the discriminatee's co-workers, and yet these witnesses were produced not by the discriminatee, but by her employer, who submitted the conflicting testimony in an effort to at least limit the discriminatee's backpay to the lesser amount testified to by the plaintiff 's fellow waitresses.7 Id. at 604. Here, Atlantic did not pr oduce similar testimony, and, as we have explained, the evidence it did intr oduce was not really persuasive on the issue.

The Board's dissent also questioned the ALJ's calculations because both the ALJ's award and the compliance specification concluded that backpay should be in an amount that differed from both what Atlantic alleged the discriminatees earned, and what the discriminatees themselves claimed to have earned. Yet, as observed by the Board, the tip amounts for Jenkins and Pur cell used in the compliance specification and adopted by the ALJ ar e only approximations that "fall within the middle range of the tip income claimed by the discriminatees in their testimony." Supp. Dec. at 2. This methodology, while a bit impr ecise, does not render the award invalid. See Buncher v. NLRB, 405 F.2d 787, 790 (3d Cir. 1968) (en banc) (stating that Board seeks only "approximation" of backpay owed and thus specification was not objectionable on gr ound of inconsistencies with work histories of some employees). Also, in Hacienda Hotel, 279 N.L.R.B. at 605, when quantifying the amount of backpay, the Board attempted to resolve significant testimonial conflict over the amount of tips cocktail waitresses received, and arrived at a reasonable approximation based on the evidence before it.

_____

7. We note that while conflicting testimony lends support to an employer's assertion that an employee is lying about the amount of tips earned, this type of evidence is also not dispositive. In Hacienda Hotel, the Board upheld the backpay award even though it exceeded both the discriminatee's tax returns and the amounts testified to by the other witnesses.

16

In doing so, the Board noted that "exactitude is not possible . . . ." Id. We agr ee that such approximations are not improper.

We therefore find that, viewing the record as a whole, the Board's order of backpay was supported by substantial evidence.

C. Substantial Evidence of Mitigated Damages

Atlantic also contends that by failing to make r easonable efforts to obtain interim employment, Jenkins did not mitigate his damages and Atlantic is, therefor e, not obligated to pay Jenkins back wages. See Tubari , 959 F.2d at 454 (holding that where employee has not exercised reasonable diligence in efforts to secur e employment, employer has established that employee did not pr operly mitigate damages). Once the amount of backpay has been established, the burden to produce evidence of a failure to mitigate is on the employer. Id. at 453. This burden is heavy: "A discharged worker is not held to the highest standard of diligence in his or her efforts to secure comparable employment; reasonable exertions ar e sufficient." NLRB v. Mercy Peninsula Ambulance Serv., 589 F.2d 1014, 1018 (9th Cir. 1979); see also NLRB v. Westin Hotel, 758 F.2d 1126, 1130 (6th Cir . 1985) ("[A] wrongfully-discharged employee is only requir ed to make a reasonable effort to mitigate damages, and is not held to the highest standard of diligence"); Fabi Fashions, Inc. v. Local 107, 291 N.L.R.B. 586, 587 (1988) ("[I]n seeking to mitigate loss of income a backpay claimant is held . . . only to`reasonable exertions in this regard, not the highest standard of diligence' . . . . The principle of mitigation of damages does not require success, it only requir es an honest good faith effort . . . .") (quoting NLRB v. Ar duini Mfg. Corp., 394 F.2d 420, 423 (1st Cir. 1968)). Once again, we r eview the factual determination of the Board regar ding Jenkins' due diligence in seeking interim employment under the standar d of substantial evidence. Westin Hotel, 758 F.2d at 1130.

We find that Jenkins' testimony supports the Board's determination that his search for employment was not unreasonable. Jenkins did testify that during the seven

17

month period in question, he was caring for his mother, who was ill. Atlantic argues that this r esponsibility made him unavailable for work. However, Jenkins testified on redirect examination that during the entir e seven months, he continued to seek employment in a variety of ways. Jenkins also noted that he was still caring for his mother when he did find a position, which supports his ar gument that would have accepted full-time work throughout the seven month period in question. Based on his testimony as a whole, we agree with the Board that ther e is substantial evidence that Atlantic has not met its burden of establishing that Jenkins' lack of interim ear nings was indicative of an unreasonable search for employment, and therefore, we find that Atlantic has not established the affirmative defense of failure to mitigate his damages.

IV. Conclusion

For the foregoing reasons we will deny the Petition for Review of the Order of the National Labor Relations Board and grant the Cross-Application for Enfor cement of the Order of the National Labor Relations Boar d.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

18