

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-7-2007

# Horodenski v. Comm Social Security

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1813

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Horodenski v. Comm Social Security" (2007). *2007 Decisions.* Paper 1649.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1649

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-1813
_____

MARY E. HORODENSKI

Appellant

v.

COMMISSIONER OF SOCIAL SECURITY

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 03-cv-00539)
District Judge: Hon. Timothy J. Savage

Submitted Under Third Circuit LAR 34.1(a)
January 25, 2007

Before:  SCIRICA, Chief Judge, FUENTES, and CHAGARES, Circuit Judges.

_____

(Filed February 7, 2007 )

OPINION OF THE COURT

CHAGARES, Circuit Judge.

Appellant Mary Horodenski appeals a District Court decision upholding an

Administrative Law Judge's determination that Horodenski was not entitled to Disability

Insurance Benefits (DIB) under the Social Security Act, 42 U.S.C. § 401, et seq. In this appeal, we consider the same question the District Court did; namely, whether the Administrative Law Judge's decision was supported by substantial evidence. Because we find that it was, we will affirm.

I.

As we write only for the parties, our summary of the facts is brief. On December 1, 1998, Horodenski filed a DIB application with the Social Security Administration (SSA), in which she alleged that she had been totally disabled since July 1, 1974 due to her multiple sclerosis. Her application was denied, and a hearing on Horodenski's application was held before an Administrative Law Judge (ALJ) on May 2, 2000. By Opinion dated May 1, 2002, the ALJ denied Horodenski's claims for disability benefits, holding that she was not disabled within the meaning of the Social Security Act. Horodenski appealed the ALJ's decision to the Social Security Administration Appeals Council, which rejected her appeal on January 10, 2003. On January 29, 2003, Horodenski filed a complaint in the United States District Court for the Eastern District of Pennsylvania appealing the Social Security Commissioner's decision. By Order dated May 7, 2003, the District Court granted the Commissioner's motion for a voluntary remand after the SSA was unable to produce a complete transcript of the May 2, 2000 hearing before the ALJ, and because certain portions of the audio recording of that proceeding were inaudible.

2

Upon remand, the ALJ held a de novo hearing on Horodenski's disability claim on May 12, 2004. At this hearing, the ALJ heard testimony from Horodenski and her husband, as well as a vocational expert.

Horodenski testified that she was employed by General Electric as an assembler for six years prior to her alleged disability onset date of July 1, 1974. Horodenski further testified that she began to feel exhausted in 1970 after the birth of her first child, notwithstanding the fact she took two months of maternity leave. When these feelings of exhaustion persisted, Horodenski went to see her doctor. Due to her fatigue, Horodenski testified that her husband and mother-in-law were forced to perform the bulk of household chores, including child care. Additionally, Horodenski testified that she suffered periodic episodes of numbness in her ribs, legs, arms, and spine, and that each episode lasted for several months. These problems, Horodenski testified, rendered her unable to "function in a normal daily life," and she therefore did not return to work at General Electric.

Horodenski's husband corroborated his wife's testimony. He testified that Horodenski was unable to perform most household chores, and was limited to changing diapers and feeding and clothing their children. He further testified that after their second child was born, Horodenski accepted a part-time job performing clerical work, but had to quit due to her fatigue, swelling in her legs, and stiffness in her joints.

3

In addition to the Horodenskis' testimony, the ALJ also reviewed documentary evidence relating to Mary Horodenski's medical problems. The evidence showed that in May 1975, Horodenski was being treated by her physician, Dr. Harold Goldfarb, for vision problems that stemmed from nerve paresis.[1] Dr. Goldfarb referred Horodenski to a neurologist, Dr. Lawrence Leavitt. Horodenski reported to Dr. Leavitt that she suffered from periodic headaches and numbness in her left foot. During her examination, Horodenski also informed Dr. Leavitt that she developed an abrupt onset of weakness in her left arm and chest in May 1974, and that a physical examination at that time showed signs of weakness and tenderness of the muscles in her upper left extremity, hyperactive reflexes in her upper left extremity, and decreased sensation to pinprick. Based on these symptoms, the physician who examined her in 1974, Dr. Tilly, diagnosed Horodenski with brachial plexitis. Horodenski reported to Dr. Leavitt that her symptoms dissipated within ten days, and that her strength returned almost to normal.

In his examination, Dr. Leavitt noted that Horodenski appeared to be alert and not in acute distress. Dr. Leavitt concluded that Horodenski's nerve paresis was attributable to chemical diabetes. Outside of this, however, Dr. Leavitt described Horodenski's health as "good." Dr. Leavitt found no connection between that episode and Horodenski's vision problems.

---

[1]"Paresis" refers to partial or incomplete paralysis.

Horodenski did not return to Dr. Leavitt until May 1987, twelve years later. At that time, Horodenski reported tingling sensations in her lower extremities. Upon a follow up visit in August 1987, Horodenski reported that her symptoms had resolved themselves. After a physical examination, Dr. Leavitt concluded that Horodenski was "perfectly normal," and that she had "brisk reflexes throughout; normal sensation, coordination and gait." Dr. Leavitt diagnosed Horodenski with "possible demyelinating disease and myelopathy with 'weak legs' and paresthesia."[2]

In 1991, Horodenski returned to Dr. Leavitt, complaining of blurred vision. After performing an MRI, Dr. Leavitt diagnosed Horodenski with right optic neuritis. Given her past medical history, Dr. Leavitt also diagnosed Horodenski with multiple sclerosis. Dr. Leavitt further opined that Horodenski suffered from a relapsing and remitting form of multiple sclerosis, and concluded in retrospect that this disease began during her 1974 pregnancy.

The ALJ also heard testimony from Richard Baine, a vocational expert. Baine testified that Horodenski's past employment as a electronics assembler and a clerical worker constituted unskilled or semi-skilled jobs requiring light exertion under the Social Security Act. Baine also testified that, taking into account Horodenski's age, education, work history, and residual functional capacity, she could have worked as a packer, sorter,

_____

[2]"Demyelinating disease" refers to the destruction or loss of the myelin sheath, which covers a nerve or bundle of nerves. "Myelopathy" refers to destruction of or changes of the spinal cord, often related to non-specific lesions. "Paresthesia" refers to an abnormal sensation such as burning or prickling.

5

or clerical worker during the relevant period of time. Finally, Baine testified that, based on his review of Department of Labor studies and his own personal experience as a vocational expert, he believed that each of these jobs were available both nationally and in the Lehigh Valley, Pennsylvania area, the locale where Horodenski lived during the pertinent timeframe.

By opinion dated May 20, 2004, the ALJ held that Horodenski met the disability insured status requirements of the Social Security Act on July 1, 1974, and retained coverage through June 30, 1979. The ALJ further found that during this five-year span, Horodenski's ability "to engage in work-related activities was severely impaired [due to] functional limitations resulting from relapsing and remitting multiple sclerosis." However, the ALJ determined that although Horodenski was unable to return to her prior line of work, her claim of total disability was unpersuasive. In this regard, the ALJ held that Horodenski retained the residual functional capacity to preform sedentary work not requiring fine manipulation. Because such jobs were available in both the national and local economy, the ALJ concluded that Horodenski was not disabled within the meaning of the Social Security Act at any point prior to June 30, 1979, the last day she was eligible for DIB benefits.

Horodenski appealed the ALJ's decision to the Appeals Council, which denied her appeal. As before, the Commissioner adopted the ALJ's decision.

Having exhausted her administrative remedies, Horodenski filed suit in federal court, alleging that the Commissioner erred in denying her disability claims. The parties filed cross motions for summary judgment. By Order dated October 31, 2005, a Magistrate Judge issued a report recommending that the District Court affirm the Commissioner's decision. On February 7, 2006, the District Court overruled Horodenski's objections to the Magistrate Judge's report, adopted the Magistrate Judge's recommendation, and granted the Commissioner's motion for summary judgment. Horodenski now appeals.

II.

Like the District Court, we review the ALJ's factual findings to determine whether they are supported by substantial evidence. Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). In the process of reviewing the record for substantial evidence, "we may not weigh the evidence or substitute our own conclusions for those of the fact-finder." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotations omitted). Rather, substantial evidence "is such relevant evidence as a reasoning mind might accept as adequate to support a conclusion." Id. In determining whether there is substantial evidence to support the ALJ's conclusions, we consider the record as a whole. Schaudeck, 181 F.3d at 431.

In order to establish disability status under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Stunkard v. Secretary of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988) (quoting 42 U.S.C. § 423(d)(1)). A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The SSA has promulgated a five-step process for determining whether a claimant is disabled. See 20 C.F.R. § 404.1520; Plummer v. Apfel, 186 F.3d 422, 427-29 (3d Cir. 1999). The burden of persuasion is on the claimant in the first four steps, but shifts to the Commissioner in the final step. In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If he is, the inquiry is over, and the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140 (1987). If not, analysis proceeds to step two, in which the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," the claimant's request must be denied.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the Commissioner to consider whether the claimant retains the residual functional capacity to perform her past relevant work. See id. The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the fifth and final step. At this stage, the burden of persuasion shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The Commissioner must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The Commissioner must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. In many cases, including this one, the Commissioner will seek the assistance of a vocational expert in resolving this inquiry. Apfel, 186 F.3d at 429.

IV.

A.

The parties agree that Horodenski has carried her burden in the first four steps. Accordingly, our analysis is limited to the final phase of the disability analysis. Horodenski's first assignment of error is that the ALJ's residual functional capacity determination was not supported by substantial evidence. The gravamen of Horodenski's argument is that the ALJ improperly failed to credit her claims of fatigue.

The ALJ found that Horodenski's ability to engage in work-related activities on and prior to June 30, 1979 was severely impaired due to "functional limitations resulting from undiagnosed relapsing and remitting multiple sclerosis." The ALJ credited Horodenski's claim that she was having "some difficulty using her hands for manipulation in the late 1970's." Nonetheless, the ALJ rejected Horodenski's claim of total disability, finding instead that she could perform certain sedentary work. Horodenski maintains that the ALJ must have either found her credible or not, and because the ALJ credited Horodenski allegations of debilitating fatigue, it was compelled to credit Horodenski's claim of total disability based on this fatigue. Because of this alleged inconsistency, Horodenski argues that the ALJ's determination that Horodenski retained the ability to perform sedentary work -- and the underlying residual functional determination -- cannot stand. We disagree.

It is clear from the ALJ's decision that the ALJ only partially credited Horodenski's complaints of fatigue. More precisely, the ALJ credited Horodenski's allegations only insofar as Horodenski claimed that her fatigue restricted her to sedentary work, and rejected Horodenski's allegations to the extent she argued that her fatigue rendered her unfit to perform any gainful employment. Horodenski argues that this determination is at odds with the uncontroverted medical evidence, noting Dr. Leavitt's conclusion that Horodenski has suffered "throughout her illness symptoms of fatigue and exhaustion." But this simply begs the question: There is no dispute that Horodenski suffered fatigue and exhaustion; the issue is whether the extent of her fatigue rendered her unable to work at all, or merely unable to work in certain jobs. As the ALJ recognized, there is no record evidence that Horodenski was ever diagnosed as totally disabled. In this regard, the ALJ noted that "while [Horodenski] may have suffered from fatigue in the late 1970's, one would expect to find some mention of it in the treatment records especially if it were causing work preclusive functional limitations." The standard of review mandates that we credit such a plausible inference. See Schaudeck, 181 F.3d at 431 ("Overall, the substantial evidence standard is deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.").

The ALJ's determination not to credit Horodenski's claim of total disability is further supported by inconsistencies in Horodenski's testimony. As the ALJ noted, at the

11

March 2, 2000 hearing, Horodenski testified as follows about her activities following the birth of her first child:

> I did all of the [house] work. I took care of the baby. I did the grocery shopping. Tried to do the laundry. Tried to dust. I ran the vacuum cleaner. I cleaned . . . . .

At the May 12, 2004 hearing, however, Horodenski portrayed herself as substantially more disabled than she had in her prior testimony. At the latter hearing, Horodenski testified that during the relevant period of time, her mother-in-law -- not she -- performed many of the tasks that Horodenski had previously testified that she had performed.[3]

---

[3]The relevant portion of that hearing transcript reads as follows:

QUESTION: Now how often did your mother-in-law come over?

HORODENSKI: It got to be pretty often. Three, four times a week.

QUESTION: And how long would she stay at your house?

HORODENSKI: A lot of times she was there most of the day.

QUESTION: And what would she do?

HORODENSKI: She would do cooking for me. She would do dusting for me. She sometimes ran the vacuum cleaner. She would do dishes for me. Oh, Lord, I appreciated that woman.

QUESTION: And for how long a period of time was your mother-in-law able to help you out in that way?

HORODENSKI: Oh, that was a long time, a lot of years. She would come over in the morning sometimes. She would stay for supper and clean up, and she did it for years.

QUESTION: Now was she doing that -- still doing that as of June the 30th of

Where, as here, the ALJ has articulated reasons supporting a credibility determination, that determination will be entitled to "great deference." Atlantic Limousine, Inc. v. NLRB, 243 F.3d 711, 718 (3d Cir. 2001). Given Horodenski's conflicting testimony, the ALJ was certainly entitled to conclude that Horodenski was overstating the extent of her fatigue in an effort to bolster her claim of total disability.[4] Accordingly, we cannot say that this is the extraordinary case that merits reversal of a ALJ's credibility determination. For all of these reasons, we hold that the ALJ's residual functional capacity determination was supported by substantial evidence.[5]

B.

---

1979?

HORODENSKI: Yes.

[4]Horodenski argues, unsupported by any authority, that the ALJ could not rely on the transcript of Hodorenski's earlier testimony, which she terms a "nullity." Horodenski Br. at 23. We share the District Court's dismay at Horodenski's counsel's claim that we should disregard clearly inconsistent testimony his client offered under oath at a previous proceeding on precisely the same issue before the same ALJ. See id. at 47 n.9 (District Court opinion).

[5]Notwithstanding Horodenski's argument to the contrary, our decision in Fargnoli v. Massanari, 247 F.3d 34 (3d Cir. 2001), does not compel a different result. There, we held, inter alia, that "sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity." Id. at 40 n.5. To begin with, we disagree that housework and child care -- which Horodenski claimed to have been performing daily -- constitute "sporadic and transitory activities." Moreover, unlike the plaintiff in Fargnoli, Horodenski's testimony about her daily activities is not merely significant because of its substance; it was also significant because it was internally inconsistent, which aided the ALJ in determining how much weight to afford to Horodenski's testimony.

13

Horodenski's second assignment of error is that there is not substantial evidence to support the ALJ's conclusion that other work existed in the national economy during the 1970's which Horodenski could have performed.  More specifically, Horodenski argues that because Baine's opinion was supported by his own experience and recollection instead of a recent review of statistical data for the relevant period of time, the ALJ's reliance on Baine was misplaced, and that the Commissioner therefore cannot carry her burden in the final step of the disability analysis.  This, too, is unpersuasive.

To begin with, it must be noted that at no point during the 2004 hearing did Horodenski, who was represented by counsel, pose any question or raise any objection either to Baine's qualifications generally or to his competency to offer vocational testimony in this case.  More importantly, Baine's testimony makes clear that he relied on Department of Labor surveys in reaching his opinion as to how many jobs were available during the relevant time period which Horodenski could perform given her limitations.  While it may be true that Baine did not review these reports in preparation for his testimony in this case, we do not believe that this failure renders his testimony unreliable, in view of his approximately thirty years of experience as a vocational expert, and in light of his testimony that he was certain that these reports would support his testimony.  See Woods v. Finch, 428 F.2d 469, 470 (3d Cir. 1970) (affirming hearing examiner's denial of disability benefits where vocational expert relied in part on his own experience in forming opinion).  For these reasons, we hold that substantial evidence supports the

14

ALJ's determination that there were sufficient jobs in the national economy during the late 1970's that Horodenski could have performed notwithstanding her limitations.

V.

For the foregoing reasons, we will affirm the decision of the District Court in all respects.